**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
Civil Action No.: 1:15-cv-01734-RBJ
DENNIS OBDUSKEY, an individual,
Plaintiff,
v.
WELLS FARGO, WELLS FARGO BANK,
WELLS FARGO & CO., WELLS FARGO BANK, N.A.,
WELLS FARGO HOME MORTGAGE, and
MCCARTHY AND HOLTHUS LLP,
Defendant.

---

**PLAINTIFF'S RESPONSE TO WELLS FARGO BANK, N.A.'S MOTION TO DISMISS**

---

**COMES NOW,** the Plaintiff through his counsel at Riggs Abney Neal Turpen Orbison and Lewis, in Response to Defendant Wells Fargo Motion to Dismiss, as such they plead the following:

Under the "Legal Standard" section of its Motion, Defendant claims that Plaintiff states no claim upon which relief can be granted, Plaintiff contradicts such statement and brings forth a definitive argument to refute each argument set forth by Defendant Wells Fargo.

1.      Pursuant to *Davidson v. Dill*, 503 P.2d 157 (Colo. 1972):

> [A] Compliant should not be dismissed for failure to state a Claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The Plaintiff and Defendant have failed to begin the discovery process which shall bring forth additional documentation showing disputed facts. Furthermore, within Plaintiff's complaint there are numerous issues and facts of dispute included but not limited to acceptance of payment and the honoring of former modifications.

The opinion further states:

1

The question in the present case resolves itself into whether, in the light most favorable to the plaintiff, with every doubt resolved in his favor, it can be said beyond doubt he can prove no set of facts in support of his claim which would  entitle her to relief.

Plaintiff contends there is high level of disputed facts and was seeking from bombarding the court with discovery during the initial pleadings.

## I.    PLAINTIFF'S CCPA CLAIM FAILS.

The Defendants set forth that Plaintiff's CCPA claim should be dismissed because: (1) Plaintiff does not explain what alleged conduct underlies this claim; (2) the alleged conduct does not amount to a deceptive trade practice, and Plaintiff's allegations that Wells Fargo misrepresented the true owner of the note are belied by his own documents;

The language utilized within Section 1 of Defendant Wells Fargo Motion to dismiss is a direct contradiction to Plaintiff's complaint which sets forth clear behavior that Defendant Wells Fargo has conducted which includes fraud and deceit to Plaintiff and Colorado consumers.

Plaintiff is of the belief that Defendants conduct which is highlighted herein is clear, and does constitute a deceptive trade practice to Colorado Consumers.

Colorado consumers who have outstanding mortgages should have the ability to distinguish which party is acting within the role as servicer and which party is acting within the role as lender.

Plaintiff will first address the issue of ownership.  Counsel for Defendant Wells Fargo fails to understand that the assignment filed in May, 2011, that purports to transfer the Deed of Trust from MERS to Wells Fargo is an issue of contention.

The three previous foreclosure actions, and the current pending action, asserts that Wells Fargo Bank, N.A. is the holder of Evidence of Debt. However, on more than one occasion Wells Fargo has asserted that Freddie Mac is the holder of the debt and owner.

Plaintiff argues that the bulk of alleged misrepresentations that were created by Wells Fargo should be barred based upon a statute of limitations expiring to bring forth a claim.  However this argument lacks logic. The Defendant has a long standing history of being untruthful regarding the Plaintiffs Loan.  The first untruthful representation came in 2009 however the actions have been a continuous trail of deception an ongoing fraudulent path in which each prior action led to further misrepresentations which continue as of today.  Attached are multiple new exhibits which provide additional evidence to Plaintiff's claims including Correspondence to the Office of Comptroller of the Currency updating information from a prior complaint filed in 2012.  (Exhibit 1)  It includes historical data as well as a copy of a NEW Qualified Written Request and Request for Information sent on July 17, 2015 concerning new information and misrepresentations by Defendant Wells Fargo which were received from Wells the previous month in response to a CFPB inquiry (Exhibit 37) as well as making new claims concerning chain of ownership.

Defendant Wells Fargo is of the belief the misrepresentations are time barred by the Credit Agreement Statute of Frauds, C.R.S. § 38-10-124.  The initial offer to modify the mortgage terms was signed by Plaintiff and accepted by Wells Fargo in a letter acknowledging such.  Plaintiff to his detriment has always relied on what the servicer/owner Wells Fargo provided and what directions he was given. Despite having numerous opportunities to correct the misrepresentation the Defendant Wells Fargo built upon them as highlighted within the July 17, 2015 OCC and revised QWR complaint (Exhibit 1).

Defendant Wells Fargo makes a claim that the statements and claims listed by the Plaintiff have no effect on the public interest.  However, one important factor that Defendant has failed to recognize is that   Courts are generally obligated to protect property rights in the United States and help clarify real property ownership.

Defendants sets forth elements that  to prevail on a CCPA claim, Plaintiff must allege and later prove five elements: <u>(1) the defendant engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of the defendant's business, vocation, or occupation; (3) the challenged practice significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged practice caused the plaintiff's injury.</u>

Plaintiff is of the belief he meets the five claims that are necessary to prompt a Colorado Consumer Protections Act Claim.

## UNFAIR AND DECEPTIVE TRADE PRACTICE

It is well documented that the previous law firms (Castle Law Group, Exhibit 2) that were hired by Defendant to allocate foreclosure proceedings upon Defendant inflated their pricing and fees. Defendant Wells Fargo attempts to enforce these unearned fees which is deceptive in nature.

Plaintiff contends that the fees—which appear to be for attorney fees, filing costs, clerk costs, post-sale notices and a title policy (Exhibit 3)[1]—are not collectible under Colorado law because they were imposed in a deceptive manner.  Furthermore, Defendant is wrong within his

---

[1] **The spreadsheet is difficult to read, but it appears only $3,751.24 in fees are at issue. While noting that yes, the spreadsheet is difficult to read, note that it was provided by Wells Fargo as a response to the CFPB.  It only represents a partial history, and numbers don't match up against different figures presented as (improper) validation of debt by McCarthy Holthus.  Using the term "only" to minimize the significance is always easy when it's someone else's money.**

statements as Plaintiff does NOT concede that Wells Fargo started a foreclosure action due to nonpayment.  The issue revolves around the theory of detrimental reliance (Promissory Estoppel), where Plaintiff followed instruction from Defendant Wells in a precise manner, including their advising him not to make payments as they were being rolled into the principal.

Defendant Wells Fargo asserts ("[w]hen a foreclosure has been filed, Colorado statutory law indicates the cure amount may include such items as late charges, attorneys' fees, and other costs").

The attached Exhibit 4 relates to improper fees in a lawsuit filed by the Colorado Attorney General against the law firm representing Wells Fargo in Plaintiffs first three Foreclosure action 1,2 and 3.

**CHALLENGED PRACTICE OCCURRED IN THE COURSE OF BUSINESS**

The CCPA defines "deceptive trade practice" and enumerates situations that are deceptive, most of which relate to false advertising or <u>misrepresenting the quality, nature, affiliation, or ownership of certain goods or services.  *See* C.R.S. § 6-1-105</u>.  Clearly representing that a company as owner of a property when it is not is deceptive and correct ownership of land is in the public interest. Clearly filing two foreclosure actions alleging Wells as owner when it provided no documentation proving such and appears from later documentation filed after the Notice of Election and Demand was filed in Foreclosure #2 to have been beyond deceptive but closer to theft and possibly criminal and is part of a <u>pattern of behavior </u>that cannot be taken lightly or individually cannot be piecemealed.  See Exhibit 5, where Defendant Wells asserted that they were merely the servicer of the loan and claiming that FHLMC (Freddie Mac) is the owner/investor while documents presented two years earlier and filed with the Park County Clerk's office, shows that Freddie Mac was not involved with the loan as it was assigned to Wells Fargo.   (Exhibit 6).

We also seek any and all records related to that assignment due to the questionable assignment of a mortgage to Wells Fargo by an "Assistant Secretary" who appears to have been an employee of Wells Fargo, not MERS.  (Exhibit 7) That is clearly not an arms-length transaction, yet we are asked to believe that an Assistant Secretary of a Company that has no employees (MERS), being paid by Wells Fargo in some capacity, produced this assignment with no direction or documentation from others?  (Exhibit 8)

Yet, Defendant is of the belief there is no nexus between the conduct alleged in the Complaint and the enumerated categories of deceptive trade practices.  All of these action occurred in the course of ordinary business. This is a conclusion counsel for Defendant is trying to impose on the court while it should be clear that if misrepresentation of ownership is an issue of contention in this case**.**

Wells Fargo attempts to claim they provided proper notice according to the exhibits attached to the Complaint. In addition, Wells Fargo claims they disclosed their status as the servicer on behalf of Freddie Mac, the loan investor, on numerous occasions. This is simply a falsehood.

The confusion lies within such statements that Wells Fargo has claimed on several occasions to be the owner.

The behavior regarding Wells Fargo, Freddie Mac, and MERS creates issues of fact and controversy based on the claim that the transfer via MERS is void. VOID is proper and makes the other endorsement suspect. (Exhibit 9, 10, 35)  He also was "foreclosed" from seeking elected office because it was inappropriate to do so when one couldn't be certain what might happen to

his residential address.  Plaintiff was damaged in that improvements started prior to foreclosure remained undone and significant loss of enjoyment of the house was and is significant.

Clearly counsel for Defense fails to understand that issues with MERS dropped out of the picture once Wells produced and filed an assignment transferring the ownership to Wells.   While Plaintiff also believes that the assignment was likely illegal and improper it also shows that assertions in one area in some exhibits that MERS or Freddie Mac were owner of the note, and continued to assert ownership through August 2015 when Todd Good advised that in (Exhibit 12), one must realize that if Freddie Mac was truly the party in interest, they would've had to foreclose, but since MERS had been listed as the nominee and cannot be listed as party holding the evidence of debt in Colorado, the alleged assignment transferring those "rights" to Wells had to take place. To support the likelihood that Wells Fargo foreclosure practices were designed to produce documents where none existed, those were codified in a manual.  (Exhibit 35) The transfer of ownership interest without evidence of authority to do so by representatives above that of a Wells Fargo employee representing herself as an authorized MERS "assistant secretary," is questionable at best and requires discovery.

This deceptive practice has continued to this day. The Statute of Limitations argument does not apply as C.R.S. 6-1-115 also refers includes: "or the date on which the last in a series of such acts or practices occurred or within three years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice. The period of limitation provided in this section may be extended for a period of one year if the plaintiff proves that failure to timely commence the action was caused by the

defendant engaging in conduct calculated to induce the plaintiff to refrain from or postpone the commencement of the action."

The fact that the first two foreclosures in which Wells asserted themselves as proper owners of the note was never heard at trial because the Colorado foreclosure judicial process doesn't work that way.  In addition, the improper endorsement issue and failed VOIDED endorsement wasn't discovered until it was used by then counsel for Wells, The Castle Law Group, as an exhibit prior to a planned Rule 120 hearing in 2014 (Exhibit 13).

In addition, The Castle Law Group who represented Wells under Foreclosures 1, 2 and 3 (under different names) was sued in 2014 by the Colorado Attorney General for improper foreclosure charges and practices alleging violations of the Colorado Consumer Protection Act, Colorado Anti-Trust Act and Colorado Fair Debt Collection Practices Act.  While that case is still open, note that one allegation is that there was collusion to charge $125 for posting notices on foreclosure targets homes and creating illegal profits.  (Exhibit 4, 36).  While acknowledging that Exhibit 3 is small and hard to read (it is as was received from Wells Fargo in response to the CFPB complaint in August and only provides a snapshot of a couple of months but not the entire mortgage history) and there was no foreclosure action active requiring posting in August 2014, yet there is a $250 charge for "Post Sale Notice."

Also note in Exhibit 14, which was supplied as an improper validation attachment from the McCarthy Holthus law firm on Sept 17, 2014 from Toney Green of Wells Fargo to the law Wells foreclosing law firm (improper as no reference appears anywhere to the name or account number), but note how monthly $15 "property preservation charges continue to appear through 9/12/14. While no notices ever appearing on the door of the house ever addressed "property preservation," but instead advised Plaintiff:  IMPORTANT. PLEASE CALL.  800-678-7986. PLEASE BE

READY TO GIVE YOUR ACCOUNT NUMBER.  WE ARE EXPECTING YOUR CALL TODAY. The phone number is to Wells Fargo Home Mortgage.  Surprisingly those items do not show up on the spreadsheet from the CFPB complaint in August and shows how accounting documentation appears to be easily and willfully changeable in an apparent effort to obfuscate facts.  Note in Class Action Suit (Exhibit 15), notice of which Plaintiff received in mid-October 2015 via post card (Exhibit 16) that Wells Fargo has agreed to a $25 million out of court settlement related to unnecessary and improper actions.   As the visits stopped after this suit was filed, no doubt there is confirming subpoenable records.  Note, too, in (Exhibit 17) upon inquiring about the continual notes being left at the home of the Plaintiff for many months by counsel for Plaintiff in 2013, Toney Green of Wells Fargo said, "Please tell borrower to disregard that letter as it is not legit," in reference to notices left on the house in spite of knowing Plaintiff was represented by Counsel in this matter.  Counsel representing Wells at the time also confirmed no knowledge of the notes.

Defendant Wells continued to offer proposed modifications to Plaintiff under HAMP, then withdrew the offers claiming numerous excuses such as that "the investor" declined to accept the modification when, in similar offers AFTER the assignment, Wells "appears" to take the place of the investor via the assignment, yet never purported to represent itself.   Another denial letter claimed denial as the loan had already been modified which was clearly an error.  Additionally, while HAMP implied approval after trial payment compliance, and Plaintiff was "100% assured after a 2012 offer" after verifying the terms at a face to face Wells Fargo Event in Denver, who at that time would've been the owner of the note if the questionable assignment is to be believed, then refused to modify the loan based on information they hadn't given Plaintiff.  (Exhibit 18). In addition, as another deceptive practice, Wells withdrew a sixth "trial payment" on Modification

offer #1, then sent a denial letter the same day they withdrew the payment funds from Plaintiffs checking account.  (Exhibit 19, 20)  These issues are evidence of ONGOING fraud on the part of Defendant Wells, who generally receives higher returns on a foreclosure than in modifying a loan (testimony will be sought).  *See, e.g.*, *Wagner v. Universal Financial Group, Inc.*, No. 09-cv-00038-PAB-BNB, 2010 WL 866079, at *3–6 (D. Colo. Mar. 5, 2010).  For the statute of frauds to bar Plaintiff's claims, (1) Plaintiff must be a debtor, (2) Wells Fargo must be a creditor, and (3) the claim must relate to a credit agreement of more than $25,000.  *Id.*  Plaintiff is plainly a "debtor" because he is obligated on the note.  *See* C.R.S. § 38-10-124(1)(c).  Similarly, Wells Fargo is a "creditor" because it assumed the position of the original lender who extended credit to Plaintiff under the original loan agreement. If Defendant is a creditor they must follow the rules of FDCPA.

Elsewhere in Defendant's response, counsel for Defendant Wells asserts that Freddie Mac is the proper owner and here claims that Wells is.  It can't be both and that's been a major sticking point and issue is highlighted when even counsel for Defendant Wells can't differentiate the ownership issue.

After both Qualified Written Request 1 and 2 (Exhibit 1), Wells refused to provide chain of title and ownership information, thus creating the assumption that it must be a "subpoenable" item as addressed in (Exhibit 21).  Also note that the initial modification offer was accepted and Defendant Wells provided a letter advising Plaintiff it had been accepted (Exhibit 22).  This modification was BEFORE the federal HAMP program began and Plaintiff asserts that the early confusion about the "wrong document being signed" was a smokescreen while waiting to see what benefit to Wells Fargo the federal government would be providing Wells if they moved consumers into HAMP modifications they would have financial gain.  This matter impacted thousands of homeowners during the economic collapse.  The original lender was a company named First

Magnus Financial who Plaintiff made an initial payment to which was never accounted for by neither First Magnus nor Wells.  What happened to get ownership from First Magnus to Wells has not been addressed in the QWR under RESPA. *See* C.R.S. § 38-10-124(1)(b).

Defendant Wells Fargo must realize some offers were oral, but most were in writing and some available electronically through the NACA web site (NACA is the HUD-approved organization Plaintiff selected to help assist in resolving the foreclosure matter).   The employees from NACA will testify that Wells Fargo and it's offer of modification via NACA is thus related to "a contract, promise, undertaking, offer, or commitment to lend, borrow, repay or forbear repayment of money, to otherwise extend or receive credit, or to make any other financial accommodation."  *See* C.R.S. § 38-10-124(1)(a)(I)-(III). Thus, as the CCPA claim is based on several actions of Defendant Wells Fargo.

**SIGNIFICANT IMPACT ON PUBLIC**

The actions that Plaintiff mentioned within his complaint are also highlighted by the OCC within the latest round of sanctions. Major national banks, including Wells Fargo, signed agreements with the Office of Comptroller of the Currency which the OCC continued to provide additional sanctions specifically against Wells earlier this year.  Clearly the OCC sees these issues as related to the public interest and clearly the banks would not have provided billions of dollars to avoid further prosecution by the Justice Department. Actions taken under the Independent Foreclosure Review however these actions did not limit those damaged from filing suit and seeking reparations.

Three factors must be considered in determining public impact: '(1) the number of consumers directly affected by the challenged practice; (2) the relative sophistication

and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future.'"

The insurance company All State (Exhibit 23) advises those purchasing foreclosed homes should:   Buy Lender's and Owner's Title Insurance Policies:

There are two kinds of title insurance policies—lender's and owner's policies. Mortgage lenders always require that you buy a lender's title policy. Owner's policies are optional, but they are recommended for properties that have been through foreclosure. These policies will protect you. They pay court costs and attorney's fees if someone challenges your ownership or tries to collect on an unsatisfied lien arising from work done before you took ownership. If a claim is found to be valid, owners insurance will cover your actual loss—up to the face amount of the policy. The requirement of purchasing two insurance policies based upon the improper and negligent actions of lenders such as Wells Fargo would be unnecessary if so many improper transfers hadn't been robo-signed.  *Colorado Coffee Bean LLC v. Peaberry Coffee, Inc.*, 251 P.3d 9, 25 (Colo. App. 2010) (quoting *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 149 (Colo. 2003)).

**SUFFERED INJURY BY PUBLIC AND PLAINTIFF**

The Plaintiff as well as the public have experienced tremendous problems from Wells Fargo during the past 6 years.  There have been numerous lawsuits within Federal Courts pertaining to Wrongful Foreclosure based on chain of title.

Similar to allegations that Plaintiff alleged within this complaint a Class Action lawsuit now exist regarding the placards that Wells Fargo has wrongfully placed on the door during the last 12 months.

Wells Fargo attempts to claim that the placards are placed on doors as part of a welfare check on the home. This is blatantly dishonest. Wells Fargo has been aware that Plaintiff was represented by counsel and Plaintiff had asked on more than one occasion to not disturb him with the placement of such placards.  Furthermore, Wells Fargo claimed that that they were unaware of any notice being left on door but the phone number listed upon such notice was a direct dial to Wells Fargo.

Unless you lived in a bubble the past 7-8 years and failed to know anything about group or robo-signing and problems banks self-created, these same lending institutions then agreed to pay billions of dollars in settlements via the US Justice Department to avoid criminal prosecution, it's clear that the public has been heavily indebted and harmed, and continues to be. Contrary to Defendants Wells Fargo claims, there are plausible allegations of a deceptive trade practices that Wells Fargo has perpetrated on the Public and Plaintiff.

Counsel for Defendant Wells is trying to make an assertion that he understands the intent of the CCPA and Plaintiff is of the belief his claim is clearly improper.  Having accurate  property ownership records is an essential part of Colorado's public interest, which is why (prior to MERS taking over the unofficial role regarding validity of assignments (Exhibit 8),  purchasers of foreclosed homes were unable to retain title insurance because of questionable as well as  clouded titles.  All issues stated herein are in the public interest and as one of largest loan servicers in the country improper practices have and will potentially impact millions of Americans**.**

### CAUSED PLAINTIFF's INJURY

The Plaintiff has been held in frozen state regarding repairs to the home. The Plaintiff has lived with the cloud of four foreclosures constantly lurking in the background. The

Plaintiff has been financially harmed as he has been forced to hire counsel to protect the home in each of the negotiations and foreclosure actions.  Plaintiff has detrimentally relied on Defendant Wells Fargo instructions regarding what steps it would take to achieve a modification or refinance. All of the money spent has been for naught, as each modification by Defendant Wells Fargo was later withdrawn despite Plaintiff meeting the trial payment requirements. Plaintiff has suffered significant health deterioration during these nearly $1/10^{th}$ of his life in seeking resolution.  This ongoing battle with Wells Fargo, is going into its seventh year.

## III. PLAINTIFF'S DEFAMATION CLAIM FAILS.

The Plaintiff is being forced to highlight the deceptive acts Wells Fargo has perpetrated during this loan servicing process which include  failing to abide by its own agreements in which they claim  "WFHM has updated the trade lines on his credit reports for the mortgage to indicate "Account information disputed by consumer." … This trade line comment will remain on the credit report until Mr. Obduskey notified WFMH he no longer disputes the reporting and authorized us to remove the comment." Plaintiff does, however have (Exhibit 24), from his August 28, 2015 Equifax report that states: "Consumer disputes after resolution. Foreclosure process started." The implication is that the issue was resolved; it wasn't, nor did they report the "Account information disputed by consumer," as they agreed they would. This was clearly an attempt to harm the consumers standing in the eyes of anyone who wishes to retrieve his credit report.

Plaintiff has been on notice since January 18, 2013 that Wells Fargo reported that the account information was "disputed" and Plaintiff has disputed the credit reports and sought changes, however despite requests the language failed to be amended since they quit reporting November 2015 wrong.

14

While Plaintiff has failed to locate other copies of credit reports that use the exact phrase "Dispute Resolved, Customer Disagrees," that data may be subpoenaed. Plaintiff does, however have (Exhibit 24), from his August 28, 2015 Equifax report that states: "Consumer disputes after resolution. Foreclosure process started." The implication is that the issue was resolved; it wasn't, nor did they report the "Account information disputed by consumer," as they agreed they would. This was clearly an attempt to harm the consumers standing in the eyes of anyone who wishes to retrieve the credit report.

Defendant Wells continued to not honor its agreement and the issue spans all activity from the date of the letter through filing of this action. Also note: Since the suit has been filed, Wells has removed all reference to the mortgage account in credit bureau reports from Trans Union, Experian, and Equifax. Defense alleges that Wells Fargo reported "dispute resolved; customer disagrees." (Exhibit 3) This is not a false statement because the statement refers to Wells Fargo's resolution of its investigation of the credit dispute, and Plaintiff does not contend that he "agrees" with Wells Fargo's resolution of that dispute. To the contrary, he does "disagree."

This is an attempt to use semantics to cloud the fact that Defendant Wells did not do what it agreed to do. Claiming all issues with this lawsuit are "resolved," just by virtue of saying it does not make it so. There was no resolution.

Defendants counsel is of the belief any defamation claims arising from the 2009 notices are barred by the one year statute of limitations. C.R.S. § 13-80-103. Clearly Wells Fargo Defense Counsel must realize that over the course of four foreclosure actions, a total of 20 notices were published defaming plaintiff.  The real defamation comes from all the inaccurate written comments that are produced with each foreclosure. The first of such notice came in 2009 (However, there have been 5 after each NED filing. (Exhibit 25, 26)  Most recently, five notices were published in

the Park County Republican and Fairplay Flume between July 24, 2015 and August 21, 2015.  In

the Fairplay Flume and action recorded with the Park County Public Trustee. (Exhibit 27) As

Plaintiff is held as a respected member of the community involved in the political process, these

continual publications have not only defamed Plaintiff, they have contributed to him not running

for public office.

Second, Plaintiff does deny that he has been in default as he has complied and acted at the

direction of Defendant Wells Fargo. This is a clear example of detrimental reliance & promissory

estoppel. Plaintiff followed the directions of Wells Fargo employee officers and agents.

Third, Plaintiff has and continues to deny that Wells Fargo lacked the right to foreclose for

numerous issues previously mentioned. The contesting of foreclosures is highlighted within the

district court record as Plaintiff has filed a response or his counsel has filed a response to each

Rule 120 action.

The actions by Defendant Wells are clearly defamatory once facts are proven at trial.

## IV. PLAINTIFF'S EXTREME AND OUTRAGEOUS CONDUCT

The Defendant Wells Fargo is not of the belief that Plaintiff's behavior raises to the level

of outrageous conduct.  Defendant Wells Fargo has caused Plaintiff to hire legal counsel on three

separate occasions as they threatened and started foreclosure proceedings. The matter of Plaintiff

being forced to deal with three law firms is the tip of the deplorable conduct. Each prior law firm

practiced variations of the same theme. Moreover, the bigger issue here is that each firm

represented a NEW foreclosure. The initial foreclosure action, started in 2009, was extreme and

outrageous and each successive one had its own extreme and outrageous character. The

incompetence that Wells Fargo imposed during this ENTIRE PROCESS has clearly extreme and

outrageous elements.

See Exhibit 28, which, while redacted, is the actual filing presented to the Federal Trade Commission seeking feedback from consumers dealing with mortgage servicers. Plaintiff shows in high detail in those two public document filings with a federal agency that provides basis for showing how, because of how Wells Fargo Home Mortgage "service" was structured, he was unable to receive consistent and accurate information. Beginning on Page 5 of the FTC filing, plaintiff lays out in detail documentation showing his experience with Defendant Wells Fargo Home Mortgage including letters received from Defendant Wells which, even on their face, are both extreme and outrageous.

1) Defendant Wells would like to have the court ignore these actions as irrelevant because of their July 2009 date, however the seed of disruption was planted for all subsequent extreme and outrageous actions. Defendant Wells would have one believe that only the tree which grew at the end of 7 years was relevant while dismissing the seed that planted the tree as inconsequential.

2) The court must examine (Exhibit 29), a fax sent to the supervisor by Plaintiff to the supervisor of a very helpful Wells Fargo Employee in their loss mitigation department in Ft. Mill commending the representative even without having her full name but just her first name and employee ID number. She identified problems with how Wells Fargo was managing the initial offered Loan Modification and her communications with management via email which she advised Plaintiff she was undertaking should provide evidence of her findings. One business practice that Defendant Wells had in place at the time failed to allow contact with the same individual twice, thus, on successive contacts, again, Plaintiff was again given different information and advised that the original pre-HAMP modification was irreverent as he was now forced to "apply" for a new program provided by the federal

government called HAMP. It wasn't until a response from Wells Fargo related to the initial

Qualified Written Request (Exhibit 1) in 2011, did Defendant Wells provide

documentation claiming that because of plaintiff inaction, the original modification was

"deemed null and void." As "documentation" in that letter, Wells refers to a May 29, 2009

"replica" of correspondence where elsewhere they provide document copies. Plaintiff

asserts that the "replica" is another example of extreme and outrageous conduct showing

how Defendant Wells would create documentation at some point in the future when none

otherwise existed. Plaintiff asserts this also likely took place in creation of an endorsement

from First Magnus to Wells Fargo.

3)  In that same December 9, 2011 letter, Defendant Wells advises Plaintiff that Wells "does

not have a record" or receiving certain documents from Plaintiff. Plaintiff fax records show

evidence of sending requested documentation to Defendant who, for some reason, later

claimed to have never received them. This issue took place on multiple occasions and has

been discussed as a common problem mortgage servicers created for themselves, then

pushed the issue back on the consumer by claiming non-receipt.

4)  In addition, Plaintiff asserts that Defendant Wells appears to intentionally misrepresent

contacts with consumers or their attorneys. These similar type of communications still take

place with similar letters expressing a lack of being able to make contact when Plaintiff

documents most all incoming calls. Plaintiff received two phone calls late in the day from

Marissa Willey; one at 2:38pm on December 9, 2011 and a second at 4pm. The transcript

of the 4pm voicemail says, in part, "Since I haven't been able to speak to you over the

phone, I will go ahead and request a resolution sent in writing to you." Less than two hours

later, a 93 page package which included a 7-page cover sheet written by a different person

was picked up by Federal Express. This evidence is another piece of outrageous contact designed to mislead by "documenting" and attempting to distort reality. It is possible that author Sarah Dornbush is more than incredibly efficient and able to compose a 7-page cover letter and compile an additional 86 pages of documents, write, edit, proofread and verify, put it together and prepare it for Fedex pickup in 2 ½ hours on a Friday afternoon…… but it is clearly a concern. The letter states that the "last" attempt by Ms. Willey to contact Plaintiff by phone was on December 9 but fails to note that the first attempt was less than 90 minutes earlier. The documentation appears manufactured and misleading.

5) Coupled with a letter Plaintiff received from a new "single point of contact," Forrest Nelson (Exhibit 30), saying he was sorry Plaintiff was unable to resolve issues in a phone call, the fact is that Plaintiff NEVER spoke to Mr. Nelson and only left a voice message for him.

6) Plaintiff is not aware of the internal processes then, or now, at Wells but calls your attention to Exhibit 31, a June 16, 2015 Consent order amending and related items – public information showing where the Comptroller of the Currency of the Department of the Treasury after finding that numerous procedures at Wells have failed to improve since 2011 including items on Page 6: Article IV Compliance Program requiring a revised action plan including (1)(a)(i) to ensure processes to ensure all factual assertions made in pleadings are accurate, complete, timely and reliable and based on personal knowledge or a review of the banks books and records…. (ii) a clear and auditable trail exists for all factual information, (iii) processes to ensure all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying note… (iv) ongoing testing for compliance with applicable Legal  Requirements and OCC supervisory guidance

… completed by qualified persons with requisite knowledge and ability (v) measures to ensure that policies, procedures and processes are updated on an ongoing basis (vi) processes to ensure that the risk management, quality control, audit and compliance programs have the requisite authority and status within the organization so that appropriate reviews of the Bank's mortgage servicing, Loss Mitigation, and foreclosure activities and operations may occur and deficiencies are identified and promptly remedied.

7) Article IX, Mortgage Servicing. The OCC determined that Defendant Wells was still in noncompliance with a number of issues related to coordination of communications with borrowers, related to Loss Mitigation or loan modification and foreclosure activities. They were deemed still not providing good faith efforts to loss mitigation and foreclosure prevention and continue to fail on the single point of contact program so that "each borrower has access to an employee of the Bank to obtain information throughout the Loss Mitigation, loan modification, and foreclosure processes.:

8) Article XIII advises "The Bank in in continuing noncompliance with and in violation of the Consent Order, and continues to engage in unsafe and unsound practices."

9) It is important to note that All of these issues are items referenced throughout this complaint and as of two months prior to filing of this action were STILL considered problems at Defendant Wells by the OCC.

Counsel for Defendant's statement being plainly false shows it is important to understand how chain of title works and help discover how, and why, Defendant continues to fail to provide that DOCUMENTATION. Clearly the Defendant has asserted differing ownership of the note at different times as mere statements within correspondence and we are to believe that just because

Defendant states an ownership claim, it must be true.  Unfortunately, Defendant Wells Fargo makes different assertions in different letters and refused to provide any custodial historical, unequivocal documentation to support any of its ownership claims. Even Freddie Mac (Exhibit 32) claims that as of July 29, 2015 Freddie "Freddie Mac Owns your Mortgage." If Freddie Mac truly was the owner, they would be required to be the current holder of the evidence of debt, however, in each of 4 foreclosure actions Wells has asserted they are the holder.

Furthermore these claims do not simply fail because of the statute of limitations the historical perspective or seeds were planted in this case in 2009 and continued to grow the tree with each subsequent intentional and misleading event. The emotional distress continues TO THIS DAY and is not time barred.

Proof of the evidence of debt as required under Colorado Statute, both before and after alleged and qualifying assignment and without following Freddie Mac guidelines concerning voided endorsements on the back of the original note. (Exhibit 14). Additionally, in correspondence with Counsel in response to the amended OCC complaint, dated August 27, 2015, (Exhibit 33) Defendant states "we have been unable to locate the hand written "void" on a Note we have sent." This statement suggests the possibility that more than one copy of the "original" Note exists and adds to the question related to forged documents expressed earlier. There is no statute of limitations on forgery in Colorado. This begs the question: did the law firm representing Wells in Foreclosure #2 seek creation of a nonexistent document to complete their files as shown in the company Foreclosure Manual (Exhibit 37)? This letter is also the FIRST TIME in any correspondence that "The Assignment of Deed of Trust assigned all rights, title, and interest to the Security Instrument TO US…" Even though in their CFPB response less than two months earlier, Defendant Wells never made such claim.

Colorado Attorney Keith Gantenbein #39213 was the signer of the NED in 2011. He testified in a state House Committee hearing in 2011, that he was regularly asked to sign documents by his employer Castle. (Exhibit 38)

Furthermore, we are not of the belief Christopher T. Groen #39976 verified the appropriate assignments existed in 2009.

To succeed on this claim, Plaintiff must allege facts supporting the following: "(1) the Defendant engaged in extreme and outrageous conduct; (2) recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) causing the plaintiff severe emotional distress." *Llewellyn*, 795 F. Supp. 2d at 1229. The bar for extreme and outrageous conduct is high. *Id.*

While counsel for Defendant makes an effort to support his clients behavior was not outrageous, this is simply an unsupported value statement and not based on facts. When Defendant Wells Fargo asked Plaintiff to provide new documents on one day so that he may obtain a modification, but then two days later denies a modification because the documents had not been received but never provided instruction or advise Plaintiff of a 48-hour submission requirement, is that extreme, outrageous and causative of severe emotional distress? When Defendant contacts Plaintiff asking him for other new documents while the plaintiff advised the Defendant he was out of town and would provide the documents 10 days later and the Defendant acknowledges that and makes note of it in his system, then Defendant closes the modification request less than a week later, is that outrageous? (In that case, Plaintiff contacted Defendant Wells Fargo who advised him that yes, the note was there and yes, they would re-start the process). Those type of items are left out of letters Wells Fargo supplied Plaintiff as "according to our records…" These are also clearly why the OCC continues its actions seeking compliance from Defendant Wells. In this case, Defendant Wells in its August 27, 2015 letter to Plaintiffs' counsel in fact uses this case as an

example stating that "on January 5, 2010, we had not received necessary documents to review Mr. Obduskey for payment assistance. As a result our review was closed. The letter fails to mention two important facts: 1) that Plaintiff was in New Mexico and advised Defendant he would supply the new documents just requested within 10 days, though Defendant Wells still closed the review. Doubly outrageous: in this case Defendant Wells Fargo had continued to withdraw Modification payment amounts beyond the requisite 3 that HAMP provided for. To add insult to injury, the Defendant took SIX payments from Plaintiffs checking account and the sixth payment was taken THE SAME DAY as the letter advised Plaintiff the review was closed. THE SAME DAY. Is THAT outrageous or just amazing?

Counsel for Defendant fails to note that these issues are subjective.  However, Plaintiff has enumerated in different ways (Exhibit 34) in which Plaintiff laid out numerous extreme and outrageous issues to the Colorado State Senate Judiciary Committee. That testimony was part of the growth process of the tree and that historical documentation cannot be considered in a vacuum.

This argument is totally irrelevant as the only "foreclosure proceeding" which ever made it to a 120 hearing was in Foreclosure #1 in which Plaintiff spent $3,000 to hire an attorney to attend a scheduled Rule 120 hearing with him after filing his own response, the attorney (Sean Paris) and Plaintiff appeared in District Court in Park County at the date and time set for the hearing. Attorneys for Wells Fargo failed to appear and sought and was granted an extension. The hearing never took place and Wells, which we learned later didn't really hold the evidence of debt and no filing of an assignment took place, eventually withdrew the action.

In Foreclosure # 2 and #3 Plaintiffs' counsel prepared and filed responses to Rule 120 Hearings which were vacated days prior to the hearing taking place. Create significant financial harm, each dollar utilized could have went to Wells Fargo but for their wrongful conduct.

This is now the 4th foreclosure which Defendant Wells has threatened. Is that outrageous? Plaintiff suffered emotional distress, considerable lost time from work, and money. Is that outrageous?

Plaintiff was in negotiation with Wells Fargo while in each foreclosure situation essentially Wells Fargo was dual tracking.

The term "requisite documentation" used by Defendant here is a word that contains two edges. If we examine Foreclosure #1 in 2009, we come to the discovery after two years that Defendant Wells clearly was not a party of interest and did not possess the requisite documentation to complete a foreclosure. Plaintiff filed the response for the Rule 120 hearing on his own and asserted that Wells was not a party of interest, but later, determined that it was in his best interest to be represented by counsel. Despite spending funds this foreclosure was later withdrawn.

Similarly, true in Foreclosure #2, Plaintiff was forced to hire counsel to protect his home. In the second foreclosure action an alleged assignment was created and was filed after the NED but before any Rule 120 hearing took place.

Plaintiff was forced to endure a third foreclosure that was eventually withdrawn in 2014 a day before the Rule 120 hearing. Plaintiff is currently facing his 4th foreclosure.

Is requiring Plaintiff to go through and prepare for FOUR foreclosure and spend your life savings and retirement to defend each action outrageous?

Does Defendant Wells Fargo think the outrageous threshold has been exceeded by requiring, time and time again, for plaintiff to resubmit documents in order to continue a never-ending HAMP modification process even after making all of such trial payments?

Defendant, Wells Fargo is seeking that this court to dismiss Plaintiff's claims despite four foreclosures being brought by different law firms and Wells Fargo's failure to disclose or acknowledge Freddie Mac's involvement in the loan, despite dozens of requests.

Each case is unique and this one is no exception, owing to the high level of documentation provided by Plaintiff. The desired conclusion that Defendant asserts by claiming that "Colorado Courts regularly dismiss outrageous conduct claims by borrowers against mortgagees or servicers" is not applicable given the facts in this case. Please note that "regularly" is not "exclusively." The Tatten case is irrelevant and breach of contract and assertions in it bare no similarity to this case (In this case, Tatten represented himself as an attorney pro se and the case primarily focused on a breach of contract. He also testified in a State House hearing seeking to change Foreclosure laws in 2011 (so I've met him and his case is totally different).

## V.   PLAINTIFF'S UNLAWFUL COLLECTIONS ACTION CLAIM FAILS.

Defendant alleges Foreclosures are governed by the specific 15 year statute of limitations in C.R.S. § 38-39-205, rather than the 6 year general debt collection statute of limitations in C.R.S. § 13-80-103.5. See, e.g., Mortg. Invs. Corp. v. Battle Mountain Corp., 70 P.3d 1176, 1179 (Colo. 2003).

However, Plaintiff's counsel clearly is attempting to circumvent the fact that attempting to hold a person liable for an outstanding debt related to real property as well as attempting to take such property from a legal perspective is a debt collection and FDCPA and FCPA laws apply. In the current legal matter both Defendants Wells and McCarthy Holthus have debt collection disclaimers on virtually all correspondence. (See Attached)

Clearly, Counsel for Defendant Wells failed to review the entire text of the Colorado Supreme Court ruling in <u>Mortg. Invs. Corp. v. Battle Mountain Corp., 70 P.3d 1176, 1179 (Colo. 2003):</u>

We hold that an action to foreclose on a deed of trust is governed by the fifteen-year limitations period contained in section 38-39-205, 10 C.R.S. (2002), <u>when a party has commenced suit for default on the original promissory note within the six-year limitations period</u> contained in section 13-80-103.5, 5 C.R.S. (2002).

In the absence of a clear expression of legislative intent to the contrary, a statute of limitations specifically addressing a particular class of cases will control over a more general or catch-all statute of limitations. <u>Persichini v. Brad Ragan, Inc.</u>, 735 P.2d 168, 172-73 (Colo. 1987).

Section 13-80-103.5 is a general and broad limitations provision that encompasses "<u>all</u> actions for the enforcement of rights set forth in <u>any</u> instrument securing payment of or evidencing any debts." § 13-80-103.5(a), 5 C.R.S. (2002) (emphasis added).

Sections 13-52-102, 5 C.R.S. (2002), and 38-39-205, 10 C.R.S. (2002), are specific limitations provisions that apply to actions to collect payment of a debt through execution on judgment liens and foreclosure actions on deeds of trust. Therefore, the specific provisions control a creditor's execution on a judgment lien and foreclosure on a lien of a deed of trust, <u>once the creditor has sued on the promissory note within the six-year period provided for in section 13-80-103.5(1)(a), 5 C.R.S. (2002), and reduced it to judgment.</u> This is not the case in Obduskey v Wells Fargo.

If, however, a creditor fails to sue to enforce the promissory note after default within the six-year limitations period, the creditor's right to foreclose on the lien of the deed of trust is extinguished under section 38-39-207, 10 C.R.S. (2002).

Section 38-39-207 provides: The <u>lien created by any instrument</u> shall be extinguished, regardless of any other provision in this article to the contrary, at the same time the right to <u>commence a suit to enforce payment of the indebtedness</u> or performance of the obligation secured by the lien is barred by any statute of limitations of this state. (emphasis added).

Within this legal matter Defendant Wells Fargo does not commence suit on a promissory note within six years of default, the deed of trust is extinguished because the six-year limitations period in section 13-80-103.5(1)(a), 5 C.R.S. (2002), would bar enforcement of the promissory note; therefore, the lien would be extinguished under section 38-39-207, 10 C.R.S. (2002). <u>Martinez</u>, 730 P.2d at 313 ("under [section 38-39-207], when an action to recover on a promissory note is barred, any lien securing such note is extinguished").

But, if a party commences suit on the promissory note <u>within six years of default,</u> subsequent collection of payment of the debt through execution on a judgment lien or foreclosure on the lien of the deed of trust is not barred by section 38-39-207, 10 C.R.S. (2002).

In the matter before the court, no circumstance exists that would change the statute of limitations to the 15 years.

The court should examine <u>*Drake v. Tyner*, 914 P.2d 519, 522 (Colo. App. 1996)</u>  as the fact pattern within this case does not revolve around an acceleration letter as Defendant Wells Fargo Home Mortgage provided Plaintiff dated June 5, 2009.  The acceleration letter was followed the following month by filing a Notice of Election and Demand with the county trustee. See Packet

Plaintiff is in complete disagreement regarding if the six-year limitation applies, it began no earlier than October 1, 2011, and the foreclosure action is timely based on HAMP payment.<u>..</u>

27

Wells Fargo must recognize that they advised that the entire amount is due in an acceleration letter, there is nothing that the foreclosing party can do to alter the six-year clock. The matter of tolling relates primarily to installment debt and future payments, however, it is not an issue in a foreclosure process when the entire balance is declared due. The clock cannot be removed nor amended once it begins to tick. Additionally, the Plaintiff does NOT admit to making partial payments. Payments were made based on the promise by Wells Fargo to deliver a loan modification. Plaintiff alleges and Defendant has shown that through its continued outrageous actions, Defendant Wells never did plan to modify the mortgage. The funds on three different modifications went to Wells and Wells made a profit, it is clear that Wells still intended to foreclose. This is bad faith and theft.

Defendant Wells Fargo allegations that the foreclosure proceeding was timely initiated in May 2015 is at best a play on words as the issues of timeliness is brought to the forefront by the lack of action of Wells Fargo's has taken during the last six years. There was announcements to accelerate debt and the start of foreclosures but there has failed to be any completed action. Should Counsel Representing Wells seek a Rule 120 hearing at this point, they will be filing a frivolous claim because they, too, know the law and are on notice.

Plaintiff asserts that the Notice of Election and Demand ("NED") recorded on May 12, 2015 was not an "action" because no complaint was filed, and thus any Rule 120 hearing is now untimely because it was not sought within six years of the cause of action accruing in June 2009.

There is no requirement for a person or company filing a Notice of Election and Demand to continue to a court action and the Rule 120 process does not only relate to foreclosures. The Colorado Rules of Civil Procedure are clear and does require a court ACTION to be considered an action (CRCP Chapter 1). The NED filed with the Public Trustee only is a conduit prior to

actually request the action by putting the public on notice that someone is preparing to possibly file to change ownership of property. That can be done either via a Rule 105 or Rule 120 hearing in Colorado, to the extent the court is involved, the note holder must obtain an Order Authorizing Sale pursuant to Rule 120 of the Colorado Rules of Civil Procedure by filing a verified motion, followed by a hearing. C.R.S. § 38-38-105(2)(a); C.R.C.P. 120(a), (d).[2]

The argument provided here is wordplay and also misconstrues the Claim. The claim is that the Defendant Wells has FAILED to properly and timely <u>request</u> a legal Court Action within six years of.

Barring a clear statement from the Colorado Courts to the contrary on specific statutes, the state court has provided clear guidance which cannot be summarily dismissed. The foreclosure CANNOT TAKE PLACE without a court action authorizing Sale and it is clearly written as a requirement in the statute. Additionally, mortgagees do not have to foreclose on mortgages that are in default and are free to negotiate with mortgagers. The term "non-judicial foreclosure" as it relates to Colorado is a misnomer as a court action is required, within the applicable 6-year statute of limitations on an accelerated debt.

Regardless of that issue, we refer back to the issue of an Improper Validation of Debt by McCarthy Holthus, representing Wells Fargo in this current foreclosure as a debt collector governed by federal and state laws.

---

[2] **The suggestion that a Rule 120 hearing is not adversarial ignores the fact the process allows interested parties to file a Response. This action also requests that the Federal Court review the existing Rule 120 process and declare it unconstitutional. The process, in fact, has been so limited it represents a deprivation of life, liberty and property under the US Constitution.**

Because Defendant McCarthy Holthus failed to properly provide validation of the debt in proper form to the Plaintiff, then started efforts to collect the debt prior to validating it.  Actions taken by Defendant McCarthy Holthus continue to be in violation of the Act because they have yet to provide proper validation to Plaintiff as required by statute.  Thus, even the posting of notice on the door and submitting the NED to the Trustee violates the Act and the only way that can be remedied by Defendant McCarthy Holthus is by first, properly providing validation of the debt to the plaintiff, second, filing a new NED, and third seeking a Rule 120 action.  Unfortunately, restarting the clock on that end would also prove fruitless as it, too, will violate the Statute of Limitations.

## VI.    PLAINTIFF'S OTHER CLAIMS FAIL.

Clearly Counsel for Defendant Wells wishes to avoid the issue of a Constitutional Action related to the Rule 120 process, however, the process has an impact for thousands and thousands of Colorado foreclosure "victims."  The Complaint alleges that Wells Fargo did not timely respond to Plaintiff's June 15, 2011 Qualified Written Response ("QWR").  (Dkt. 1, pp. 3-4, ¶¶ 7-10.)  Defendant Wells has, thus far, continued to fail to provide evidence of any sort proving they are even a party with foreclosure rights to the property.  Defendant Wells has asserted that "some items will only be provided by subpoena," yet they have never differentiated what those items are nor provided an appropriate accounting for the loan.  Plaintiff suspects this issue is a part of the OCC actions against Wells and it is likely that their procedures and processes cannot provide real appropriate evidence.  The initial QWR was written not by the Plaintiff, but by a HUD-Representative agency required during the HAMP process as part of the modification process.  NACA, the Neighborhood Assistance Corporation of America, is that organization and experienced in such matters and had reason to question several pages of items based on their

experience.   NACA forwarded the 1st QWR to Wells through its Boston Offices, Wells acknowledges receiving it but not when, and misfiling it, apparently never acknowledging its existence to NACA nor providing a point-by-point response.   Because the lack of a response begot no answers, Plaintiff again filed a new QWR with Wells on July 17, 2015.   Defendant Wells, as of a letter dated September 25, 2015, has yet to respond, saying it "is going to take longer than originally anticipated. (New Exhibit XXX).   Note, too, that the letter provides confused dates.   The letter is dated September 25, 2015, says "we anticipate a final resolution will now be provided to you by September 27, 2015, and it was mailed September 28, 2015.

**CONCLUSION**

For these reasons, Plaintiff requests that this Court deny each of Defendants attempts for dismissal.   Defendant Wells has provided no arguments that even rise to a bare level to approve any dismissals on any Claim.