

# As Wells Fargo is Accused of Fabricating Foreclosure Papers, Will Banks Keep Escaping Prosecution?

MARCH 21, 2014 | STORY

## TOPICS

Wells Fargo

U.S. Economy

## GUESTS

**LINDA TIRELLI**
*attorney representing clients being foreclosed on by Wells Fargo. Earlier this month, she discovered the Wells Fargo manual on how to produce missing documents to foreclose on homeowners. She is a partner at the Garvey, Tirelli & Cushner law firm in White Plains, New York.*

**KEVIN WHELAN**
*campaign director of the Home Defenders League, a national movement of underwater homeowners and allies who organize to keep people in their homes and demand accountability.*

## LINKS

"Wells Fargo made up on-demand foreclosure papers plan: court filing charges." (New York Post)

Read Wells Fargo foreclosure manual

Home Defenders League

A new internal report says the Justice Department massively overstated its successes in targeting mortgage fraud while in fact ranking it as a low priority for investigation. The Justice Department's inspector general says despite playing a central role in the nation's financial crisis, mortgage fraud was deemed either a low priority or not a priority at all. This comes as a recently revealed internal Wells Fargo document appears to guide lawyers step by step on how to fabricate missing documents to foreclose on homeowners. Wells Fargo is the country's largest mortgage servicer and services some nine million home loans.

## TRANSCRIPT

*This is a rush transcript. Copy may not be in its final form.*

**JUAN GONZÁLEZ:** A new internal report says the Justice Department massively overstated its successes in targeting mortgage fraud while in fact ranking it as a low priority for investigation. The Justice Department's inspector general says despite playing a central role in the nation's financial crisis, mortgage fraud was deemed either a low priority or not a priority at all. In one instance, Attorney General Eric Holder claimed to have filed lawsuits on behalf of homeowner victims for losses totaling more than $1 billion, but the actual amount was 91 percent less, around $95 million.

This comes as a recently revealed internal Wells Fargo document appears to guide lawyers step by step on how to fabricate missing documents to foreclose on homeowners. Wells Fargo is the country's largest mortgage servicer and services some nine million home loans.

**AMY GOODMAN:** State and federal regulators are now focusing on the allegations in the lawsuit brought by Linda Tirelli, who joins us now. She's an attorney representing clients being foreclosed on by Wells Fargo. Earlier this month, she discovered the Wells Fargo manual on how to produce missing documents to foreclose on homeowners. She's a partner at the Garvey, Tirelli & Cushner law firm in White Plains, New York.

In Minneapolis, we're joined by Kevin Whelan, campaign director for the Home Defenders League, a national movement of underwater homeowners and allies who organize to keep people in their homes and demand accountability.

Wells Fargo declined *Democracy Now!*'s interview request, saying they're in a, quote, "quiet period" pending the announcement of their quarterly earnings.

We welcome you both to *Democracy Now!* Linda Tirelli, let's begin with you.

**LINDA TIRELLI:** Good morning.

**AMY GOODMAN:** Can you describe this manual, how you got it and what it reveals?

EXHIBIT - 10

**LINDA TIRELLI:** Absolutely. The manual that I have, it's actually entitled the "Wells Fargo Home Mortgage Foreclosure

Attorney [Procedure] Manual, Version 1." And it says on it that it's last published 2/24/2012. Mind you, the national mortgage settlement agreement was announced a week prior, on 2/19/2012.

The way I obtained it, it was actually sitting right there on the Internet, of all things. A colleague of mine, through a Max Gardner's Bankruptcy Boot Camp, which I am a member, an active member, gave it to me and said, "Hey, I found this online, and I know you're doing a lot of Wells Fargo cases. Maybe you can use this."

Reading it, my jaw just dropped. As I see it, it's clearly outlining procedures, not just for the $12-an-hour robo-signers that we've heard about all these years, but for the lawyers, who need to be held accountable to a much higher degree. It's the manual for the lawyers to actually fabricate documents, as I see it, and request that documents that are lacking be fabricated by Wells Fargo. It's absolutely appalling.

JUAN GONZÁLEZ: Well, you know, we've had on *Democracy Now!* a couple of times the Brooklyn Supreme Court judge, Arthur Schack, who raised a campaign over—not only over the robo-signers in many cases that he had before his court, but also over the bank officials and the attorneys who participated in this fraud. And there have been several judges in different parts of the country who have raised these issues. How do you think this advances the whole issue of going after—of having the smoking gun to go after these companies?

LINDA TIRELLI: Well, I think that judges cannot make determinations based on suspicion. OK? This is the first and only internal document that I'm aware of that clearly outlines the fraud. And that's how I put it in my allegations to the court. And we are very, very fortunate in New York to have a number of proactive judges who get it, but unfortunately, they're few and far between across the country. My hope is that judges as wonderful as Arthur Schack and as great as many of our federal judges—I do appear mostly in federal courts—that they will be proactive, they will take this seriously and start to question Wells Fargo on their procedures.

AMY GOODMAN: I want to read a bit from the Wells Fargo document. In this section called Note Endorsement, it says, quote, "If the blank endorsement is in the file for an original state, execute the endorsement, send the original document to the attorney, and complete the Z02 step." Can you explain what this means?

LINDA TIRELLI: Sure. I take that to mean that if there is actually an endorsement that exists, they need to endorse it. But as the party in—

JUAN GONZÁLEZ: And by "endorsement," you mean?

LINDA TIRELLI: Sign it over.

JUAN GONZÁLEZ: Oh.

LINDA TIRELLI: OK. But the question is: Do they have the authority to sign it over? Is it an authorized endorsement? Who's signing it over? As the lawyer, I would need to know that before proceeding with a foreclosure. If it's a document that needs to—if it was a note that needed to be endorsed, under a pooling and servicing agreement, which is followed by every securitized trust—and most of these loans, let's face it, are owned by securitized trusts in some form or another—they should have been endorsed long before the foreclosure was ever started, at the time that it was actually acquired by the trust, or allegedly acquired by the trust.

AMY GOODMAN: So this manual talks about how to fabricate a document—

LINDA TIRELLI: Absolutely.

AMY GOODMAN: —that you don't have, that you need.

LINDA TIRELLI: That's how I'm reading it.

AMY GOODMAN: That Wells Fargo would need.

LINDA TIRELLI: Exactly. That's—

AMY GOODMAN: To foreclose on the house.

LINDA TIRELLI: Exactly right. That's exactly how I'm reading it. I'm reading it to say that it's not just, when there is a blank endorsement, fill in the blank. But sometimes when there—there's actually a procedure in here, as I read it, for when there's no endorsement, OK? Go ahead and endorse the note. Just request that the note be endorsed. And that's what we call, in our area of law, a "tada endorsement." The bank produces a copy of a note, just for example, that has no endorsement on it, and then when we ask about it and say, "Gee, this note is not endorsed to your client. How is it that you're—you know, you're bringing foreclosure?" and they say, "Oh, here, use this version. Tada! Now we have an endorsement." And it's always a rubber stamp, that you or I could go to Staples and purchase for $9.95.

JUAN GONZÁLEZ: You also, one of your cases, came across a document which was purportedly from an official of Washington Mutual Bank in 2010, but Washington Mutual didn't exist in 2010, because it had collapsed back in 2008.

LINDA TIRELLI: 2008, that's right. That document was signed by Mr. John Kennerty in—who works for Wells Fargo, or worked for Wells Fargo at the time. And in this procedure manual, there's actually a procedure for obtaining what's called an assignment of mortgage, OK? So, basically, as I'm reading this procedure, it's saying, "Gee, if you need an assignment, the attorney should request it through the document department, and then, magically, one will appear for you." And that's exactly what we're seeing. The people that work for Wells Fargo in these various departments, when they receive a request from an attorney, they take that as permission to actually sign something, without doing any research whatsoever. How is it, as you point out, we had anything assigned from in a company that ceased to exist two years prior? It just simply makes no sense. That document's fabricated. And in that particular case, I will point out, the judge actually deemed that document to be a fraudulent document on record.

AMY GOODMAN: I remember when Congresswoman Marcy Kaptur was standing on the floor of the House and telling homeowners, "Stay in their homes and demand that they produce the note. Produce the note." I wanted to go to Eric Schneiderman. Last May, the New York attorney—the New York attorney general announced plans to sue Bank of America and Wells Fargo for violating the terms of a settlement aimed at curbing foreclosure abuses. The $26 billion settlement was reached in 2012 between five major banks and 49 attorneys general. It provided basic protections for homeowners, such as requiring banks to notify them about missing documents within a certain time period. But Schneiderman said the banks had violated the terms of the settlement with impunity. At the news conference in May, he lifted a massive sheaf of papers to show the hundreds of complaints issued by homeowners against the banks.

> ERIC SCHNEIDERMAN: Two of the participating servicers, Wells Fargo and Bank of America, have flagrantly violated their obligations under the settlement. I've sent a letter to the monitoring committee, the body that oversees the implementation of the national mortgage servicing settlement, notifying them of my intention to sue both Wells Fargo and Bank of America for noncompliance with servicing standards spelled out in the settlement. This enforcement action, which is the first taken under the settlement, is based on 339 individual complaints from New Yorkers against these two banks in just the last six months

AMY GOODMAN: Linda Tirelli, can you explain what happened with this case?

LINDA TIRELLI: Yes. Well, first of all, I want to point out, and very much to Mr. Schneiderman's credit, within four hours of the *New York Post* writing the article exposing this documents, within four hours, I received not only a phone call, but an email from Attorney Schneiderman's office, and we had a long discussion about it. I also received the phone call and an email from the New York State Division of Financial Services. So I'm hoping that they are now launching new investigations.

Basically, to put—as I understand Mr. Schneiderman's point, Wells Fargo was signing off on the national mortgage settlement agreement out of one side of its mouth. Out of the other side, they were republishing their manual to say, "Hey, we're going to continue business as usual. All right? Throw some money at it. It's done. Quiet down the homeowners. We'll just continue business as usual." And that's what we're seeing. That's exactly what we're seeing.

JUAN GONZÁLEZ: Kevin Whelan, from the Home Defenders League, can you put this in a national context of the mortgage crisis? Here we are now, six years into the home mortgage crisis that crashed the entire economy.

KEVIN WHELAN: Absolutely. Thanks you for having me, very much, today. We hear, every time there is an uptick in real estate prices in some parts of the country, that the foreclosure crisis or the mortgage crisis is over. And certainly, Wells Fargo and the big banks are back to making record profits and feel like everything is great. But foreclosures are still tearing apart many communities, particularly communities of color that were targeted for predatory and subprime lending. And one in five American homeowners is still underwater, meaning they owe more on their house than the house is currently worth.

So we've made the banks whole without effectively curbing their abusive practices to give homeowners the runaround, to use falsified documents and to rush toward foreclosure when there's a perfectly good way to reach a different settlement. And they've not done enough to make homeowners whole, including doing principal reduction that they promised to do under
settlements.

AMY GOODMAN: And can you respond to this latest news about the attorney general—the office making a low priority or no priority at all going after these mortgage lenders?

KEVIN WHELAN: Yeah, absolutely. The news is no surprise to people that have been fighting foreclosure in communities around the country. We work with 25 community groups in our at-large organization, so people can come find us at HomeDefendersLeague.org and get on a phone call and learn how to start a petition and fight for their homes. And people have been, you know, in cases all over the place, trying to stave off foreclosure.

We had a family in New Jersey last month, Paulette McQueen and her 86-year-old mom, who had missed one mortgage payment in 2010, went to Wells Fargo the next month with both checks in hand, and Wells Fargo wouldn't take their money and started a three-year campaign to take their house. That was only resolved when people in 13 cities delivered petitions to Wells Fargo's offices around the country. And they finally got a call back and are going to work out a solution to be able to stay in their home. It was a whole week before a sheriff's sale.

So, it's—you know, families that are facing this know both that the housing crisis isn't over and that nothing has happened that's on a deep enough or broad enough scale to make the banks fearful or sorry for either the harm they've done, or change their behavior in fundamental ways.

JUAN GONZÁLEZ: Now, there are some localities, some local governments, that have tried—intervened themselves in trying to beat back the crisis of people being kicked out of their homes. Could you talk about some of those examples?

KEVIN WHELAN: Yeah, there—one thing that's—we know there's something to it, because the banks, led by Wells Fargo, are especially panicked and angry about the solution. But in Richmond, California—I think you had the mayor of Richmond, Gayle McLaughlin, on the show before—has been a city that's led the way—and many more are going to follow—to enact principal reduction, meaning resetting loans to their current market value on the local level. And this is exciting because, while these federal agencies, like the Justice Department, are too often captive of the big banks, people can use democracy and win on the local level sometimes.

The concept for this particular program is that cities would work with other investors to buy the loans at their fair market value on the secondary market, which is pennies on the dollar of what these underwater loans are worth, and help refinance homeowners into new loans that have equity. And this is a concept that has gotten started in Richmond, but people are meeting even today in different cities around the country to spread this. And I think, not so much because it would cost them money as because it's a chance for people to use the rule of law and democracy to impact the economy and impact banks' behavior, banks like Wells Fargo have sued, unsuccessfully, and made all kinds of threats about redlining communities in order to try to stop it. People can go to FightingForeclosures.org and learn more about that particular plan and get involved in that campaign.

AMY GOODMAN: Kevin Whelan, you've been arrested outside of Attorney General Eric Holder—outside the Justice Department, demanding more action. And yet, Linda Tirelli, we have this latest news that as—that the attorney general claimed to have filed lawsuits on behalf of homeowner victims for losses totaling more than a billion dollars. In fact, it was 91 percent less than this, at $95 million. What do you think should happen? Who gets prosecuted here, and who is let go free?

LINDA TIRELLI: I think that at this point, let's face it, we're never going to see a perp walk, as much as we'd like to see one,

because this is illegal activity that we're talking about. At the very least, I think now this document gives the New York attorney general free access to every attorney who's ever followed this manual and hold them accountable, because it is illegal. And we are held, as attorneys, to a much higher standard. We have to do a certain amount of due diligence, and we cannot knowingly produce false documents and submit them into a court of law. Our entire judicial process is based on integrity. This document, as I read it, OK, is going to bypass the integrity of the entire system, and it becomes now the civil procedure rules according to Wells Fargo. And that's the rules they're willing to play by.

JUAN GONZÁLEZ: And more importantly, the author of that document, right, who approved that document for all these lawyers to use.

LINDA TIRELLI: Exactly right, exactly right. And I want to point out that I actually introduced this document—

AMY GOODMAN: We have five seconds.

LINDA TIRELLI: —in a motion to reopen discovery after a trial, and my hope is that we will get discovery and get someone to a deposition table and get the answer to that.

AMY GOODMAN: Before Eric Holder was attorney general, he was a senior partner at Covington & Burling. Among the banks they represented, the four largest: Bank of America, Citigroup, JPMorgan Chase and Wells Fargo.

LINDA TIRELLI: No shock there.

AMY GOODMAN: Linda Tirelli, attorney representing clients being foreclosed on; Kevin Whelan of Home Defenders League, thanks so much for joining us.