| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | |
| STATE OF COLORADO *ex rel.* JOHN W. SUTHERS, ATTORNEY GENERAL FOR THE STATE OF COLORADO; and JULIE ANN MEADE, ADMINISTRATOR, UNIFORM CONSUMER CREDIT CODE,<br><br>Plaintiffs,<br><br>v.<br><br>THE CASTLE LAW GROUP, LLC; ABSOLUTE POSTING & PROCESS SERVICES, LLC; RE RECORDS RESEARCH, LLC, d/b/a REAL ESTATE RECORDS RESEARCH; COLORADO AMERICAN TITLE, LLC; LAWRENCE E. CASTLE; CAREN A. CASTLE; RYAN J. O'CONNELL; and KATHLEEN A. BENTON,<br><br>Defendants. | ▲   **COURT USE ONLY**   ▲ |
| JOHN W. SUTHERS, Attorney General<br>ALISSA GARDENSWARTZ, Reg. No. 36126*<br>First Assistant Attorney General<br>ERIK R. NEUSCH, Reg. No. 33146*<br>MEGAN PARIS RUNDLET, Reg. No. 27474*<br>JOHN FEENEY-COYLE, Reg. No. 44970*<br>REBECCA M. TAYLOR, Reg. No. 40645*<br>MARK L. BOEHMER, Reg. No. 40352*<br>LAUREN M. DICKEY, Reg. No. 45773*<br>Assistant Attorneys General<br>Colorado Attorney General's Office<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway<br>Denver, Colorado 80203<br>Telephone: 720-508-6228<br>*Counsel of Record | Case No.:<br><br>Courtroom: |
| **COMPLAINT** | |

EXHIBIT - 36

Plaintiffs, the State of Colorado, by and through John W. Suthers, Attorney General for the State of Colorado, and Julie Ann Meade, Administrator, Uniform Consumer Credit Code (collectively the "State"), through their counsel of record, state and allege against Defendants, including individually, the following:

## INTRODUCTION

1.      This action is the result of the State's extensive two-year civil law enforcement investigation of foreclosure law firms, including the largest firm The Castle Law Group, that have performed the vast majority of the roughly 275,000 residential foreclosures in Colorado since 2006.  This investigation revealed that these law firms, including The Castle Law Group, unlawfully exploit the foreclosure process by misrepresenting and inflating the costs they incur for foreclosure-related services to fraudulently obtain tens of millions of dollars in unlawful proceeds. Although the law firms agreed to perform these routine foreclosures for a flat attorney fee, they viewed this fee as insufficient and devised a scheme to generate additional millions by inflating foreclosure costs.  Homeowners, purchasers, investors, and taxpayers paid for and continue to pay for these fraudulent charges.

2.      Defendants systematically and intentionally misrepresent, inflate, and charge unreasonable, unauthorized, unlawful, and deceptive costs for posting foreclosure notices, obtaining title products, preparing documents, and providing other foreclosure-related services.  They do this primarily through affiliated vendors, which create invoices for foreclosure services at costs grossly inflated above the actual costs and above what unaffiliated vendors charge.

3.      Defendants get away with this extensive fraud by taking advantage of the inherent lack of oversight in the foreclosure process.  The mortgage servicers that hire the law firm on behalf of the loan's investor rely upon the law firm to perform all the legal work in the foreclosure for an agreed-upon flat attorney fee (the "maximum allowable fee") and to pass through only its actual, necessary, and reasonable costs.  Servicers do not conduct market analyses of these foreclosure costs; rather, they rely on the law firm to comply with the law and investor guidelines by charging costs that are actual, reasonable, and the market rate.

4.      Defendants also get away with charging excessive, unauthorized, and unlawful costs because no homeowner, purchaser, or taxpayer can challenge the law firm's claimed costs.  Nor may the public trustees, which administer the foreclosure process, or the courts, which authorize the foreclosure sale, challenge these costs. Thus, a homeowner seeking to save his home from foreclosure or a person purchasing a property at auction must pay whatever costs the law firm claims to have incurred in performing the foreclosure.  If the property returns to the lender, the mortgage servicer assesses these costs to the investor or insurer, which are

often borne by taxpayers.

5.      The law firm abuses this system, which it knows is devoid of administrative or judicial oversight, to charge whatever costs it can get away with in order to generate significant revenue beyond the maximum allowable fee.

6.       For example, in early 2009 when the Colorado legislature began considering a bill to allow for a brief foreclosure deferment that would require posting a notice similar to an eviction notice, Caren Castle of The Castle Law Group ("Castle" or "the law firm") and Stacey Aronowitz of Aronowitz & Mecklenburg ("Aronowitz")—second only to Castle in volume—worked together on what they could get away with charging.  Stacey Aronowitz emailed a foreclosure lawyer in another state that also required a foreclosure posting: "I am curious how much you get away with charging . . . ."  She later emailed Caren Castle: "I just wanted our offices to try and get on the same page on what we are charging for all of this." They agreed that Caren Castle would try to seek approval from Fannie Mae, the dominant investor in the foreclosure industry, to charge $125 for this new posting, not the $25 charged for similar eviction postings.

7.      Accordingly, these two competitors, who handle 75 percent of Colorado foreclosure filings, coordinated to set the minimum price for posting at $125—an amount unrelated to the actual cost for such postings or the market rate charged by unaffiliated vendors.  Once the bill requiring the foreclosure posting passed, Castle and Aronowitz secured financial interests in posting companies and claimed fraudulent and inflated costs of at least $125 per posting.  This amount multiplied by tens of thousands of foreclosures resulted in a multimillion-dollar windfall to the posting companies and, directly or indirectly, to the law firm, Larry Castle, and Caren Castle (collectively "Castle Defendants") and to Aronowitz.

8.      The following year, realizing the financial windfall afforded by the first posting, Larry Castle anonymously lobbied the legislature to pass a second posting requirement so that the law firm's affiliated posting vendor could charge $125 for an additional posting, for a total of $250 per foreclosure.

9.      Operating with no checks and unrestrained by market principles by selling foreclosure services to themselves, the Castle Defendants charge between $350 to $650 in unlawful costs per foreclosure by making false, misleading, and deceptive statements of costs to homeowners, servicers, investors, and the public on reinstatements, cures, bids, and invoices, as follows:

- $125 for each of the two required foreclosure postings for a total of $250 per foreclosure when the market rate for each posting is $25;

- $275 for title search reports when the market rate is $100;

- $400 to $500 in "cancellation fees" for foreclosure title commitments ordered by the law firm during the foreclosure;

- $50 for a one-page form document that can be completed in seconds and is already compensated in the allowable foreclosure fee;

- $25 for a bankruptcy search that costs $3 or less; and

- $10 to $25 for a military status search that is free.

10.     Defendants' multimillion-dollar unjust enrichment came at a tremendous expense to the public.  Not only does it harm desperate homeowners facing foreclosure and persons buying properties at auction, it reverberates to the public at large, as servicers hiring the law firm pass these costs to taxpayer-funded investors or insurers.  As Fannie Mae informed Castle and other Colorado foreclosure law firms during a 2010 training, its credit losses are taxpayer-funded and every effort should be taken to reduce foreclosure costs, because every dollar reduction in costs is significant when multiplied by a large volume of loans.

11.     These inflated foreclosure costs also negatively impact housing and loan costs outside the foreclosure industry.  Moreover, the law firm's use of affiliated businesses charging inflated costs has adversely affected competition from businesses that could provide foreclosure services at a much lower market rate.

12.     The increased cost of foreclosures and negative impact on competition wrought by Castle's and Aronowitz's use of affiliated vendors charging above the market rate for foreclosure services was recently highlighted when Fannie Mae suspended Castle and Aronowitz from handling any Fannie Mae foreclosures. Fannie Mae began referring its files to new law firms using unaffiliated vendors, which provide postings at $25, not $125, and title searches at $85 to $105, not $275. This development has already significantly reduced the costs per foreclosure.  These unaffiliated vendors—which were effectively cut out of the foreclosure market by Castle's and Aronowitz's affiliated vendors—have since substantially increased their volume of work by providing services to new law firms at actual market prices.

13.     Defendants' conduct violates the Colorado Consumer Protection Act, the Colorado Antitrust Act of 1992, and the Colorado Fair Debt Collection Practices Act, and harms homeowners and the public.

## LEGAL AUTHORITY AND PARTIES

14.     The State, pursuant to its law enforcement authority under the Colorado Consumer Protection Act, §§ 6-1-101–115, C.R.S. (2013) (CCPA), the Colorado Antitrust Act of 1992, §§ 6-4-101–122, C.R.S. (2013) (Colorado Antitrust Act), and the Colorado Fair Debt Collection Practices Act, §§ 12-14-101–137, C.R.S. (2013) (CFDCPA), seeks to enjoin Defendants from engaging in deceptive and other unlawful practices, including charging inflated, deceptive, unauthorized, unlawful, and unreasonable costs in foreclosure proceedings in Colorado, to disgorge unjust proceeds, to completely compensate or restore to their original position any persons injured by Defendants' conduct, to recover statutory civil penalties, and to recover costs and attorney fees.

15.     The CCPA is a remedial statute intended to deter and punish deceptive trade practices committed by businesses in dealing with the public. *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 50–51 (Colo. 2001). The statute's broad purpose is "to provide prompt, economical, and readily available remedies against consumer fraud." *Id.* (quoting *W. Food Plan, Inc. v. Dist. Court*, 598 P.2d 1038, 1041 (Colo. 1979)).

16.     Under the CCPA, evidence that a person engaged in a deceptive trade practice shall be prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition.

17.     The CFDCPA is a remedial consumer protection statute that is liberally construed to protect consumers against deceptive, misleading, and unfair debt collection practices. *Flood v. Mercantile Adjustment Bureau*, 176 P.3d 769, 772–74 (Colo. 2008).

18.     With the Colorado Antitrust Act, the Colorado legislature has found and determined that competition is fundamental to the free market system and that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, and the highest quality commodities and services.  C.R.S. § 6-4-102.

19.     John W. Suthers is the duly elected Attorney General of the State of Colorado, and is authorized under C.R.S. § 6-1-103 to enforce the CCPA and may bring an action against any person for engaging in deceptive trade practices.  The State may seek injunctive relief to prohibit the person from violating the CCPA, obtain disgorgement of unjust proceeds, civil penalties, and restitution, and recover costs and attorney fees.  C.R.S. §§ 6-1-110, 6-1-112, & 6-1-113.  He is authorized under C.R.S. § 6-4-111(1) to enforce the Colorado Antitrust Act, obtain civil penalties under C.R.S. § 6-4-112(1), and recover costs and attorney fees under

C.R.S. § 6-4-111(4).

20.    Julie Ann Meade is the Administrator of the Uniform Consumer Credit Code and charged with enforcement of the CFDCPA.  She is authorized to bring an action to restrain any person from any violation of the CFDCPA, obtain injunctive relief, restitution, disgorgement, civil penalties, costs and attorney fees.  C.R.S. §§ 12-14-103(1), 12-14-135.

21.    Defendant The Castle Law Group, LLC, is a Colorado limited liability company, f/k/a Castle Meinhold Stawiarski, LLC and Castle Stawiarski, LLC, organized on December 20, 2002, with a principal place of business at 999 18th Street, Suite 2201, Denver, Colorado 80202 and/or 999 18th Street, Suite 2301, Denver, Colorado 80202.  It is, and at all relevant times was, regularly engaged in collecting, or attempting to collect, directly or indirectly, from Colorado consumers debts owed or asserted to be owed or due others.

22.    Defendant Absolute Posting & Process Services, LLC ("Absolute") is a Colorado limited liability company organized on May 21, 2009, with a principal place of business at 11990 Grant Street, Suite 110, Northglenn, Colorado 80233.

23.    Defendant RE Records Research, LLC, d/b/a Real Estate Records Research ("RERR"), is a Colorado limited liability company organized on November 26, 2008, with a principal place of business at 1610 Wynkoop Street, Suite 350, Denver, Colorado 80202.

24.    Defendant Colorado American Title, LLC ("CAT") is a Colorado limited liability company organized on June 19, 1998, with a principal place of business at 6300 South Syracuse Way, Suite 100, Englewood, Colorado 80111.

25.    Defendant Lawrence Edward Castle ("Larry Castle") is an individual with a principal business address at 999 18th Street, Suite 2201, Denver, Colorado 80202 and/or 999 18th Street, Suite 2301, Denver, Colorado 80202.  He is or was a member and owner of the law firm, and is or was responsible for the management decisions at the law firm, including decisions regarding foreclosure costs charged to borrowers, investors, servicers, and the public.  He has engaged in or caused another to engage in a deceptive trade practice.  He is personally liable under the CCPA, the Colorado Antitrust Act, and the CFDCPA for the conduct of the law firm, Absolute, RERR, and CAT, by approving, directing, participating, or cooperating in their conduct.  Larry Castle is, and at all relevant times was, regularly engaged in collecting, or attempting to collect, directly or indirectly, from Colorado consumers debts owed or asserted to be owed or due others.

26.    Larry Castle has or at one time had an ownership or financial interest

in at least Defendants Absolute and CAT through his financial interest in RP Holdings, LLC, ("RP Holdings"), f/k/a CMS Holdings Group, LLC, which provided foreclosure services to the law firm. He supervised and managed the operations of, among other entities, RP Holdings and CAT. In 2009, RP Holdings obtained a forty-percent interest in Absolute. Through involvement with the law firm and RP Holdings, he participates or has participated in the decision-making by Absolute, RERR, and CAT, including the costs invoiced to the law firm.

27.     Defendant Caren Ann Castle ("Caren Castle") is an individual with a principal business address at 999 18th Street, Suite 2201, Denver, Colorado 80202 and/or 999 18th Street, Suite 2301, Denver, Colorado 80202. She is the managing member and owner of the law firm, and is responsible for the management decisions at the law firm, including decisions regarding foreclosure costs charged to borrowers, investors, servicers, and the public. She has engaged in or caused another to engage in a deceptive trade practice. She is personally liable under the CCPA, the Colorado Antitrust Act, and the CFDCPA for the conduct of the law firm, Absolute, RERR, and CAT, by approving, directing, participating, or cooperating in their conduct. Caren Castle is, and at all relevant times was, regularly engaged in collecting, or attempting to collect, directly or indirectly, from Colorado consumers debts owed or asserted to be owed or due others.

28.     Caren Castle has or at one time had an ownership or financial interest in at least Defendants Absolute and CAT through her financial interest in RP Holdings. Caren Castle supervised and managed the operations of, among other entities, RP Holdings and CAT. In 2009, RP Holdings obtained a forty-percent interest in Absolute. Through involvement with the law firm and RP Holdings, she participates or has participated in the decision-making by Absolute, RERR, and CAT, including the costs invoiced to the law firm.

29.     Defendant Kathleen Anne Benton ("Kathleen Benton") is an individual with a principal business address at 11990 Grant Street, Suite 110, Northglenn, Colorado 80233. She has engaged in or caused another to engage in a deceptive trade practice. She is personally liable under the CCPA and the Colorado Antitrust Act for Absolute by approving, directing, participating, or cooperating in its conduct.

30.     Defendant Ryan Joseph O'Connell ("Ryan O'Connell") is an individual with a principal business address of 1610 Wynkoop Street, Suite 350, Denver, Colorado 80202. He has engaged in or caused another to engage in a deceptive trade practice. He is personally liable under the CCPA and the Colorado Antitrust Act for Absolute, RERR, and CAT by approving, directing, participating, or cooperating in their conduct.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction to enforce the CCPA in actions by the Attorney General under §§ 6-1-103 and 6-1-110; the Antitrust Act under § 6-4-109; and the CFDCPA under § 12-14-135.

32.     Under CCPA § 6-1-103, venue is proper in the City and County of Denver because portions of the transactions involving the deceptive trade practices occurred in the City and County of Denver.

33.     Under Colorado Antitrust Act § 6-4-109, venue is proper in the City and County of Denver because portions of the transactions involving the antitrust violations occurred in the City and County of Denver

34.     Under CFDCPA § 12-14-135, the Administrator may bring an action in the City and County of Denver.

## TRADE AND COMMERCE

35.     Defendants have transacted business in the state of Colorado. Defendants' unlawful activities alleged in this Complaint have occurred in and have had a substantial effect upon both intrastate and interstate commerce.

## RELEVANT MARKETS-ANTITRUST CLAIM

36.     For purposes of the antitrust violations alleged herein, the relevant product market is the market for foreclosure postings.

37.     For purposes of the antitrust violations alleged herein, the relevant geographic market is the state of Colorado.

## PUBLIC INTEREST

38.     Through the deceptive trade practices of their businesses, vocations, or occupations, Defendants have defrauded tens of thousands of Colorado homeowners and members of the public by claiming false, misleading, deceptive, unauthorized, unlawful, and unreasonable foreclosure costs presented to and payable by homeowners in foreclosure, purchasers of foreclosed properties, mortgage servicers, and taxpayer-funded investors and insurers.

39.     The deceptive trade practices have injured legitimate businesses because the law firm created affiliated businesses to provide foreclosure-related services at grossly inflated costs and then directed all, or substantially all, its foreclosure work to the law firm's affiliated businesses.  This practice injured

competitors and destroyed or substantially lessened competition.

40.     Defendants' conspiracy to restrain free and open competition in the provision of certain foreclosure services has corrupted our free market system to the detriment of competitors, consumers, and the public.

41.     Accordingly, these legal proceedings are in the public interest.

## GENERAL ALLEGATIONS

### I.     INDUSTRY OVERVIEW

### A. Residential Foreclosure Process in Colorado

42.     Foreclosures in Colorado are largely an administrative process conducted through the public trustee offices in each county.  The servicer, on behalf of the lender or investor that owns the mortgage in default, hires the law firm to complete the foreclosure from initiation through transfer of the property to the successful bidder at auction or back to the investor.

43.     Before the law firm files a foreclosure, the borrower may reinstate the default by paying what is owed to the lender in late payments and what the law firm claims it incurred in fees and costs as set forth on a reinstatement notice. After the law firm files a foreclosure but before the auction, the homeowner may "cure" the foreclosure with the public trustee's office by paying what is owed in late payments to the lender, and whatever fees and costs the law firm claims to have incurred in processing the foreclosure as set forth on the cure statement.  If the property proceeds to auction, the successful bidder must pay whatever fees and costs the law firm claims to have incurred as set forth on the bid statement.

44.     A court's only involvement in a foreclosure is when the law firm files the required motion under Rule 120 of the Colorado Rules of Civil Procedure to authorize the foreclosure sale by the public trustee.  This action is often resolved without a hearing because it is generally limited to an inquiry of whether the borrower is in default or in the military, neither of which is typically in dispute.

45.     Neither the public trustee's office that receives the cure and bid statements, nor the court that handles the Rule 120 action, has authority to question the law firm's claimed fees and costs, allowing the law firm to unilaterally and without accountability dictate the costs for any foreclosure-related services.

46.     Many foreclosures never proceed to sale and are withdrawn due to a cure, bankruptcy, or loan modification, meaning that the law firm's claimed costs, however improper, are often assessed to homeowners.  For foreclosures that proceed

to sale, the costs are assessed to homeowners in a deficiency judgment, purchasers at the auction, or the owner or insurer of the loan, often borne by taxpayers.

### B.    Fee/Cost Structure in Foreclosures

47.    The allowable costs and fees charged by a law firm conducting foreclosures are governed by the mortgage loan documents, servicer agreements, investor guidelines, including Fannie Mae, and state law.

48.    The law firm agreed to perform foreclosures for its servicer clients for a maximum allowable fee, and to seek reimbursement for only its actual, necessary, and reasonable (i.e., market rate) costs from the servicer, borrower, and investor. This maximum allowable fee, currently $1,225 or $1,250, is set by investors like Fannie Mae or Freddie Mac and is intended to compensate the law firm for all legal work required to complete a routine foreclosure.  It includes, among other things, document preparation and review, title review, coordinating postings and filings, and overhead.  In setting this maximum allowable fee, the investors take into account the work typically performed for a foreclosure in a given jurisdiction and endeavor to ensure that firms are fairly compensated and profitable.

49.    These agreements and guidelines further distinguish between the maximum allowable *fee* for work performed on a foreclosure and *costs* incurred by the law firm in processing a foreclosure.  The agreements make clear that costs incurred by the law firm and passed along to the servicer/investor must be actually incurred, necessary to complete the foreclosure, and reasonable, i.e., market rate.

50.    This distinction between fees and costs is deliberate.  To reduce overall foreclosure costs payable by homeowners and the public, investors capped the compensation that law firms could receive per foreclosure and placed limitations on pass-through costs.  These cost-control efforts were designed to minimize the cost of foreclosures and the impact of taxpayer-funded credit losses.

### C.   Servicers' Reliance on Law Firm's Representations

51.    While automated billing permits servicers to monitor whether the law firm claims a fee in excess of the maximum allowable fee, there is generally no such monitoring of costs.  Instead, servicers rely upon the law firm's representations that it will comply with investor guidelines relating to fees and costs.

52.    Servicers that hire the law firm for the investor do not absorb the law firm's costs themselves.  Rather, servicers obtain reimbursement from homeowners, investors, and insurers.  Thus, the foreclosure law firm-servicer relationship differs from a typical attorney-client transaction in which any fraudulent or excessive

charges are borne by the client alone.  Here, the servicer has little incentive to scrutinize costs because it ultimately passes those costs to someone else.

53.    Consequently, servicers rely on the law firm's representations as to what its vendors charge for foreclosure services without verifying whether these charges are actual, necessary, reasonable, or consistent with market rates.

## II.    DEFENDANTS EXPLOIT THE FORECLOSURE PROCESS TO COMMIT FRAUD

54.    Despite agreeing to perform foreclosures for a maximum allowable fee per file, the Castle Defendants viewed this fee as insufficient.  Accordingly, they devised a scheme to circumvent the maximum allowable fee by inflating foreclosure costs to make millions above and beyond the maximum allowable fee.

55.    Specifically, the Castle Defendants obtained unjust enrichment by (1) using affiliated vendors that they owned or controlled, which generated invoices containing fraudulently inflated costs for foreclosure services like postings and title products; and (2) claiming and inflating costs for services that were already compensated by the maximum allowable fee as separate and reimbursable.

56.    Because Castle has performed roughly 100,000 foreclosures in Colorado since 2006, having its affiliated vendors perform foreclosure-related services at artificially high rates unrelated to its actual costs generated millions in profit for the Castle Defendants.  It also increased foreclosure and housing costs for the public and eliminated fair market competition.

57.    As the most influential investor in the foreclosure industry, Fannie Mae largely sets the industry standard for foreclosures.  Fannie Mae defines an affiliated entity as "any entity in which any principal of the firm or employee or family member of any principal or employee of the firm has a direct or indirect decision-making, ownership, or financial interest."  Under this definition, Absolute, RERR, and CAT are affiliated entities of the Castle Defendants.

58.    Castle's servicer clients did not verify whether the costs it charged for foreclosure services performed by affiliated vendors were related to the actual cost or the market rate for such services.  At most, some servicers checked to see whether invoices from the vendors matched costs invoiced to the servicer—they did not question the actual cost incurred by the affiliated vendor or whether those charges were competitive.  This superficial inquiry allowed the law firm to continue its unlawful conduct undetected because the Castle Defendants controlled the affiliated vendors and directed their invoicing.

59.     By coordinating with its largest competitor Aronowitz to charge similar costs for services, such as postings, Castle facilitated the appearance to the servicers that the costs were competitive and the market rate.

60.     The Castle Defendants also fraudulently obtained additional compensation by billing for attorney work already included in the maximum allowable fee as a separate cost or as part of an existing cost.  For example, as discussed more fully below, the law firm charged $50 to prepare a statement of qualified holder—a form document taking seconds to prepare with no third-party cost.  To avoid detection, the law firm simply invoiced this $50 as a "cost" and fraudulently earned $50 more per foreclosure file.

61.     Again, because of servicer reliance on the law firm and the inability of homeowners, public trustees, or courts to challenge these costs, the law firm got away with charges that were over and above the maximum allowable fee and greatly inflated above the actual costs.

62.     As set forth in detail below, the Castle Defendants intentionally circumvent the maximum allowable fee by making false, misleading, and deceptive statements about the actual costs they incur in processing a foreclosure to obtain millions of dollars in unjust enrichment, either through manipulating the invoicing of an affiliated entity or through misrepresentations of fees as costs.

63.     Defendants Kathleen Benton, through Absolute, and Ryan O'Connell, through Absolute, RERR and CAT, participated in this conduct by invoicing the law firm for inflated amounts for various costs and thus also exploited the foreclosure process with the Castle Defendants to obtain significant unjust enrichment.

## III.    THE FORECLOSURE POSTING SCHEME

### A. The First Foreclosure Posting: Notice of Deferment

64.     On or about May 4, 2009, the Colorado legislature passed House Bill (HB) 1276, which allowed borrowers an opportunity for a brief foreclosure deferment.  HB 1276 was signed into law on June 2, 2009 and became effective August 1, 2009.  It provided that a borrower in foreclosure who is qualified by a HUD-approved foreclosure counselor under a prescribed financial analysis has an opportunity to defer the foreclosure for up to 90 days by making reduced payments.

65.     HB 1276 required the lender or its attorney to post a notice on every eligible borrower's door at the start of the foreclosure advising the borrower to contact a foreclosure counselor to determine whether he is qualified for deferment. An eligible borrower is, among other things, one whose primary residence is in

foreclosure of a first mortgage of $500,000 or less, which is the case for most foreclosures in Colorado.

66.     Although this new law required that the law firm simply post a form notice and then sign and file a form affidavit with the public trustee confirming the posting—routine work similar to eviction postings—the Castle Defendants, Benton, O'Connell, and Absolute, immediately capitalized on the posting to gouge borrowers, investors/insurers, and servicers by designing and implementing a scheme to charge $125 per posting instead of the $25 that unaffiliated companies were charging for eviction and deferment postings.

67.     As a result, unaffiliated posting companies were largely shut out of the foreclosure posting business when Castle and Aronowitz, the two largest foreclosure firms in Colorado, formed or invested in their own affiliated posting vendors to do this work for $125, and directed all the law firms' postings to their respective affiliated vendors.

**B. Planning the Scheme**

68.     Realizing early in 2009 that HB 1276 was likely to pass, Castle and Aronowitz were already planning to make as much money as possible off the new foreclosure posting.

69.     Castle and Aronowitz knew that they could not invoice for any legal work created by the new posting (e.g., contacting the posting company and filing the affidavit of service confirming the posting) as a "fee" because the maximum allowable fee already provided compensation for this work.

70.     For example, Fannie Mae's guidelines state that the maximum allowable fee includes "[e]xecuting all steps necessary to obtain service of process on all persons entitled to notice, including review of process server affidavits and referral and tracking of published notices," and "[p]ublishing and posting the requisite notices as required by local foreclosure law."

71.     Rather than seek approval from Fannie Mae or other investors for an increase in the maximum allowable fee for any legal work created by HB 1276, the law firms concealed additional revenue above the maximum allowable fee through inflated posting costs charged by "third-party vendors" over which they exercised control and from which they benefitted.

72.     Castle invested in, and Aronowitz created, affiliated entities to post the notices and to manufacture invoices for at least $125 to appear as actual "costs" of the posting charged to the law firm by the "third-party vendors."

73.     These concerted steps taken by Castle and Aronowitz correlated with an email Stacey Aronowitz sent a Maryland foreclosure lawyer on March 6, 2009—the day HB 1276 passed the house chamber on the final reading: "Question for you—how much do you all charge for your 'posting' in whatever stateof [sic] yours that changed the rules on that? CO is switching to this model and I am curious how much you get away with charging . . . ."

74.     This lawyer responded that his state's law requires the law firm to make two good faith attempts at *personal service* of the foreclosure complaint, and only if personal service is unsuccessful should the law firm post it on the door and mail it by regular mail and certified mail.  He went on to state that:

> [M]ost of our work is done by a company that we own. That company charges us $75 per defendant, per address to complete service.  If the new CO law just requires posting without any attempts at personal service, I think a reasonable charge would be less than that.

75.     The lawyer continued, "In any event, the trick is to form a new posting company, owned by you and your dad (I'd leave Joel out for obvious reasons) and hire one good person to manage the company and hire his driver/posters.  He or she negotiates the best flat fee deal he can with people around the state to post properties, and the company marks up that charge from there for a tidy profit and bills your law firm."

76.     Likewise, Caren Castle looked at other states like California with a posting requirement, *not* to determine a reasonable or market rate, but rather to determine what the Castle Defendants could get away with charging.  During the State's investigative hearing, she admitted that she looked, or had Kathleen Benton look, only at the amount charged by California companies, but Caren Castle did not consider the actual services encompassed within that charge.

### C. Absolute's Affiliation with the Castle Defendants

77.     Just before the foreclosure deferment posting went into effect on August 1, 2009, RP Holdings, f/k/a CMS Holdings, which performed many of Castle's foreclosure services from 2007 to 2012, and in which Larry Castle and Caren Castle had a financial interest, obtained a forty-percent interest in Absolute through an Economic Interest Purchase Agreement dated August 1, 2009.

78.     At that time, RP Holdings, which Larry Castle controlled as chairman of the board, CEO, or president, installed the Castle Defendants' business partner and accountant Ryan O'Connell as Absolute's part owner and accountant to monitor revenue and ensure payments from Absolute to RP Holdings.

79.     Prior to handling the deferment postings caused by HB 1276, Absolute completed eviction postings for Castle at $30 per posting.  Absolute's work for a deferment posting is substantially similar to an eviction posting; however, once Absolute became affiliated with Castle, which coordinated with its largest competitor to set the price, Absolute charged $125 for the foreclosure deferment.

80.     That Absolute continued to charge $30 for the similar eviction notices after HB 1276, and that unaffiliated vendors charged around $25 for both eviction notices and foreclosure deferment notices, reveal those amounts as the actual market rate for all posting services, whether during or after the foreclosure.

81.     Absolute's July 1, 2009 Operating Agreement identifies Kathleen Benton as owning 55 percent, O'Connell with 5 percent, and RP Holdings having a forty-percent economic interest.

82.     Despite owning a majority of Absolute, the Operating Agreement prohibits Benton from making "[a]ny changes to the pricing schedule for the company" without the written consent of the majority of the three managers— meaning without either the consent of RP Holdings or O'Connell.

83.     While the parties do not believe that they ever signed the Economic Interest Purchase Agreement, O'Connell testified during the State's investigative hearing that the parties adhered to its provisions, and that he transferred significant revenue from Absolute to RP Holdings because of this agreement.

84.     Benton did not seek out the Economic Interest Purchase Agreement; rather RP Holdings and O'Connell—the Castle Defendants' accountant—presented it to her with the promise of significant future business relating to the postings. She understood that the law firm would direct all its postings to Absolute, which, based on projected foreclosure filings at the height of the foreclosure crisis and the $125 charge, would net millions.

85.     O'Connell testified that he had conversations in or around May 2009 with Larry Castle about the agreement and O'Connell's role with Absolute:

> He [Larry Castle] wore a hat at RP Holdings Group as CEO or director on the board. And so, in the manner as a course of business planning, there was an opportunity that a lot of parts were going to be put together. I think most of my endeavors at one time or another were discussed with Larry.

86.     In response to why Absolute would grant this financial interest to RP

Holdings, O'Connell testified:

> CMS Holdings Group had the right to choose their vendors for law firm business as part of the whole business model. And the threat existed, or had been tossed out there by [RP Holdings' officers], that perhaps we don't need Absolute, perhaps we could go set this up ourselves and do it.
>
> [T]hey were the 800-pound gorilla that, I guess, was deemed in Kathleen's or Absolute's best interest to have a smaller piece of a big pie than to be shut out of the postings altogether with Holdings Group taking 100 percent of the work.

87.     O'Connell claimed that in the three-year period between September 2009 and September 2012, he drew only $110,000 from Absolute, and that Benton drew $1.3M. According to O'Connell, Absolute paid RP Holdings approximately $2M between 2009 and 2012, until Absolute decided to stop making payments. O'Connell also transferred money from Absolute to one or more of his companies, including IS Financial, which was owned in part by an entity, SWE Investors, that is, upon information and belief, controlled by Larry Castle. SWE Investors was also a part-owner in Professional Resources Organization, which provides leased employees to Absolute, CAT, RERR, and other Castle-related entities.

88.     After RP Holdings went into a financial receivership in 2012, Larry and Caren Castle's accountants O'Connell and Michael Dietz, and Absolute's Kathleen Benton, purchased RP Holdings' assets. O'Connell testified that he had numerous conversations with Larry Castle about the plan to purchase the assets of RP Holdings from the receivership, and O'Connell claimed that the law firm principals would be future owners of at least part of these assets. They named the new entity Next Organization, and completed the purchase of certain assets—with Larry Castle or the law firm providing the bulk of the consideration as guarantor— from the receivership in November 2012. In 2013, Absolute, like it did in 2009, granted Next Organization an economic interest in profits, this time 90 percent, and Absolute has since transferred more than $2M in profit to Next Organization.

### D. Conspiring to Fix the Price of Foreclosure Postings

89.     Central to the posting scheme were competitors Castle and Aronowitz—which dominate the foreclosure industry in Colorado—agreeing to set a minimum amount for the new posting that each firm's affiliated company charged.

90.     Four months before HB 1276 passed, Castle began laying the groundwork for the posting cost and sent a memo to its servicer clients about HB 1276 being introduced in the legislature:

> The Bill will require the posting of a notice in the specified form within 15 days of delivering a complete foreclosure package to the public trustee. *We worked hard to avoid the requirement of personal service which would have been costly to you,* as well as we could not have insured that service would have been completed in the 15 day period. . . . *Our firm is already working to be able [to] ensure this requirement can be met on your behalf.*

(Emphasis added).  At the time, Absolute charged Castle $30 for an eviction posting and $60 to $65 for two attempts at personal service—half the price that Castle and Aronowitz set for the new foreclosure posting.

91.     In a March 24, 2009 email, Stacey Aronowitz sent Caren Castle the following message with the subject line titled "HB 1276," which Caren Castle subsequently forwarded to Larry Castle, asking, "How do you want me to handle?"

> So I just wanted to follow up on our brief discussion about the posting/affidavits for this new bill.
>
> …
>
> *I just wanted our offices to try and get on the same page on what we are charging for all of this….*
>
> Let me know what you all are thinking of doing…..I will be in the office all week if its [sic] easier to talk about this over the phone.

(Emphasis added).

92.     Caren Castle, who has foreclosure law firms in other western states, discovered that posting companies in California charged $125, but this charge encompassed services much more expansive than the new Colorado posting.  In contrast to the Colorado posting that required only a single posting, the $125 charge in California included a company's charge for (1) posting the notice of sale on the property; (2) posting the notice of sale at a public place; and (3) conducting the public auction of the property, including handling the bid instructions at the

auction.  In or around 2008, Fannie Mae had approved a maximum allowable cost in California for these services at $125.

93.   Caren Castle and Stacey Aronowitz had at least one conversation in which they agreed that Caren Castle, who had the most industry influence, would try to seek approval from Fannie Mae to obtain reimbursement of $125 as a third-party vendor's cost to post the foreclosure deferment notice.

94.   In an April 28, 2009 email, Stacey Aronowitz wrote to Caren Castle:

*Overall- I have no objection to our office charging $125 in total for the posting and certification to be sent (and arguably dealing with all the tracking that will be going on w/files [sic] that do in fact go on this 90 day time out).*

*Here is my question for you- its [sic] more to how our clients would look at this from a billing perspective.*

*When you are talking about this $125 flat amount, are you saying that you would bill it as a flat 125 cost or would you separate it out into the cost for the posting and the fee for the certification/affidavit? Just to put some numbers to this- lets [sic] say Kathleen is charging you 75 across the board for every posting in the state, leaving $50 for the certification.  Technically since this certification is something that has to be signed by our offices, I would think that this is something that should be billed as a fee vs. cost.  Where this would come into play I think is at least with Chase, and to a lesser extent, Countrywide, in our financial audits.  Just from our experience, if we have an invoice from Kathleen saying the posting was 75, we are going to have issues on an audit explaining why we are including an additional 50 dollar amount that does not have an invoice in the "cost" section. I may be catastrophizing this, but if you have a solution to this- I would love to know what that would be!*

*Maybe you guys were thinking of structuring this differently than what I was thinking, so if so, please feel free to fill me in.  Also I know you have a lot of experience in other states, so you may have a better perspective on this that I am missing ;-)*

18

(Emphasis added).

95.     Castle and Aronowitz overcame any problematic billing issues noted above by having an affiliated posting entity create an invoice with a minimum cost of $125, regardless of the actual cost or market rate, and directing the profits to the law firm principals.

96.     Once Castle and Aronowitz agreed to charge $125 for the deferment posting, Caren Castle allegedly informed Fannie Mae that the posting required by HB 1276 was similar to a California posting for which companies charged around $125, which, as explained above, was an overt misrepresentation.

97.     Neither Castle nor Aronowitz received written approval from Fannie Mae to charge $125 for the posting.  The lawyer at Fannie Mae to whom Caren Castle allegedly spoke about the posting had no recollection of approving the cost; he only vaguely recalled a conversation with Caren Castle in which she mentioned the posting rate in California.

98.     Fannie Mae did no analysis of the claimed $125 cost, expecting that any vendor cost would comply with investor guidelines and the law.

99.     Caren Castle then left Stacey Aronowitz a voice mail claiming that Fannie Mae approved the $125 cost.

100.     On May 26, 2009, Stacey Aronowitz sent Caren Castle an email after the deferment bill passed the legislature and was awaiting the governor's signature:

> About FNMA [Fannie Mae] approving the $125.00 for the posting. Nice work!
>
> …
>
> Thanks again for talking to FNMA .... now all we need is for this bill to finally pass!!

101.     Stacey Aronowitz did nothing to confirm whether Fannie Mae approved the cost or, if such approval were granted, to inquire as to what Caren Castle represented the cost would include, i.e., whether it would include $100 or more to "compensate" the law firm for any additional work caused by HB 1276.

102.     Stacey Aronowitz claimed that her father Robert Aronowitz told her to "do whatever Caren [Castle] does."

103.   Though fierce competitors for the market share of foreclosures, Castle and Aronowitz knew that the posting scheme would not work unless both firms agreed on the amount to charge.  For example, Castle made no attempt to compete for Aronowitz's clients by undercutting the inflated $125 rate and offering a more cost-effective posting rate in order to attract more foreclosure referrals.  To do so might have alerted servicers to the problems with the artificially inflated rate.

104.   Because Castle and Aronowitz account for approximately 75% of the residential foreclosures in Colorado and consequently, through their affiliated entities, 75% or more of the market for foreclosure postings, one firm could not have gotten away with charging at least $125 for foreclosure postings without the other firm agreeing to charge the same.

### E.  Representations to Servicers

105.   After HB 1276 was signed into law, Castle initiated two phone conferences with numerous servicers primarily to explain the deferment process, and secondarily to convey the new cost.

106.   In anticipation of these conferences, Castle prepared and emailed a memo to the servicers dated June 2, 2009, regarding the new legislation.  It stated:

> [T]he new legislation will require the posting of a specified form notice within 15 days of delivering a complete foreclosure package to the public trustee.  In order to ensure compliance with this requirement we have worked with a 3rd party vendor who will be able to complete this new posting requirement throughout the State.  The new additional cost for the posting will be a $125.00.

107.   It continued, "We have also contacted the GSEs [government-sponsored enterprises] with respect to approval for the additional new cost associated with the posting. Fannie Mae has approved the cost of $125.00 based upon the costs that are currently approved for posting in other states."

108.   Castle prepared and emailed a similar memo to servicer clients dated July 8, 2009, to represent: "We have worked with a 3rd party vendor who will be able to complete this new posting requirement throughout the State. . . .  The new additional cost for the posting will be a $125.00.  We have also contacted the GSEs with respect to approval for the additional new cost associated with the posting. FannieMae and FreddieMac has [sic] approved the cost of $125.00."

### F. Concealing $100 or More in Unreasonable Fees in Posting Costs

109.   Neither Castle nor Aronowitz disclosed to the investors or servicers that the market rate charged by unaffiliated posting companies for the foreclosure deferment notice was around $25—the same amount charged for eviction postings.

110.   Neither Castle nor Aronowitz disclosed to the investors or servicers that they inflated the posting cost to generate additional revenue for the law firms, the posting companies, and their principals.

111.   Fannie Mae did not "approve" the $125 for posting.  At best, Caren Castle informed Fannie Mae that third-party vendors would charge the law firm $125 for the posting requirement.  Castle either misrepresented or failed to disclose information to the investors and servicers that they were going to add $100 or more to the posting charge that should have been $25, either as compensation to the law firm or to the posting company in which they had a financial interest.

112.   While Castle and Aronowitz had already tacked $100 or more to the posting cost allegedly for work related to the posting that was already covered by the maximum allowable fee, i.e., contacting the posting company and filing the affidavit of service with the public trustee, Castle continued to represent to investors that it was not compensated for this work.

113.   In statements Castle made in reports to Fannie Mae in 2011 and in 2012, it claimed to have incurred legal fees of $100 per file that it did not bill for as "Preparation of Posting Affidavits for Deferment."

114.   When questioned during the State's investigative hearing about this representation, Caren Castle stated that she believed the total charge for a deferment posting should have been $225: $100 for the law firm's preparing the affidavit of posting, and $125 for the posting company to post the notice.

115.   Castle did not explain to Fannie Mae, or any servicer, that the posting company used by Castle to post notices at $125 transferred substantial sums of money back to Castle, directly and indirectly, through RP Holdings.

116.   Representing that the cost to post a deferment notice was $125 is deceptive not only because the actual cost and the market rate by unaffiliated posting companies is $25, but because $100 of the $125 is allegedly designed to compensate the law firms and the principals.  This amount is both disproportionate to the work performed and already compensated by the maximum allowable fee.

### G. The Second Posting: Notice of Rule 120 Hearing

117.    Recognizing the significant profit from the foreclosure deferment postings, Castle used its legislative influence to obtain a second foreclosure posting requirement the following year, resulting in millions in additional, unnecessary costs to foreclosures paid by homeowners and the public.

118.    In March 2010, when the Colorado legislature was making minor amendments to the foreclosure deferment statute enacted the previous year, it inexplicably added a second, unrelated posting of a notice of Rule 120 hearing—the court proceeding authorizing the sale in every foreclosure.  Previously, the notice of Rule 120 hearing was mailed to the borrower and interested parties.

119.    Larry Castle hired a lobbyist, who also represented the public trustees, to convince legislators that a "coalition of parties" wanted a second, unrelated posting.  But he instructed the lobbyist to keep his name anonymous.

120.    In an email on March 4, 2010, the lobbyist sent Larry Castle the following in connection with the second posting bill that passed May 5, 2010:

> I talked over amending the 1276 cleanup bill with Rep. Ferrandino this afternoon.  I explained your suggestion for a replacement amendment to the one that was added onto the bill by Rep. Massey.  Ferrandino said he will talk with Morgan Carroll about it.  She is the Senate sponsor.  He asked me if I thought the PT's would be OK with adding another posting requirement.  I said I hadn't discussed it with them.

121.    The Massey amendment would have required the public trustees to send certain foreclosure documents to borrowers by certified mail, rather than regular mail.  It had nothing to do with the Rule 120 hearing.  As the lobbyist testified during the State's investigative hearing about the Massey amendment:

> The public trustees just about flipped a lid because they were like, "Do you know how much it's going to cost us to do certified mailing to every single foreclosure -- you know, a person that's in a foreclosure?  It's going to cost us a fortune."

122.    In response to the proposed Massey amendment, one public trustee emailed the lobbyist and Larry Castle: "THIS IS NOT ACCEPTABLE AT ALL. People do NOT CLAIM certified mail at the post office and it simply INCREASES

THE COST OF FORECLOSURES ($5.54 per envelope) for no benefit at all.  ALL OF THE NOTICES ARE MAILED by PTs pursuant to the provided mailing lists." (Emphasis in original).  Another public trustee complained that the Massey amendment could drive up foreclosure costs by more than $50 (depending on the number of mailings) and harm homeowners seeking to cure or modify their loans.

123.   Larry Castle seized upon this opportunity and instructed his lobbyist to propose a substitute amendment to add a second foreclosure posting.  The substitute amendment eliminated the $5.54 cost per mailing, but added another $125 in revenue for the law firm and its posting company for a second posting on every foreclosure.

124.   In a March 18, 2010 email entitled "HB 1240 - Deferment Cleanup," the lobbyist wrote to Larry and Caren Castle:

> The hearing on HB 1240 today went well, with the bill and all amendments passing unanimously.  Sen. Carroll really liked the amendment requiring posting of the notice of Rule 120 hearing and happily sold it to the committee as coming from 'the coalition' of parties who had worked so hard on the bill.  I never mentioned to her or anyone else connected with this bill – except the PT's – where the idea for the second posting came from.

125.   Knowing the financial windfall that the second foreclosure posting would garner, Larry Castle forwarded the amended version of HB 1240 to Castle's back office CFO of RP Holdings and to Castle's accountant Michael Dietz.

126.   The lobbyist testified during the State's investigative hearing that he never disclosed to the senate sponsor whose idea the posting amendment was, but told her that the public trustees "are okay with it."

127.   On May 6, 2010, the lobbyist emailed Larry and Caren Castle, "The Governor signed HB 1240 yesterday, so you can start posting the 120 hearing notices now."

128.   The lobbyist testified during the State's investigative hearing that Larry Castle "asked me to make sure that that amendment got put onto the bill." He continued: "Larry Castle told me directly that he did not want his name mentioned as the person offering that amendment."  The lobbyist also testified:

> I said, you know, "that's putting me on the spot over there

if you're asking me to run an amendment and I can't say who it's from.  It's going to be -- you know, I'm not 100 percent comfortable doing that."  I've never been asked to do that before or since.

129.    Although the second posting—the notice of the Rule 120 hearing (which was previously mailed to homeowners by the firms)—is nearly identical to an eviction posting that costs $25 to $30, Castle and Aronowitz charged $125 for the Rule 120 posting—the same amount they set for the foreclosure deferment posting.

130.    Castle and Aronowitz knew servicers would not question the $125 cost because the law firms had already succeeded in getting the first posting cost through, albeit under false representations, and that the servicers would merely rely upon whatever the law firms claimed a vendor charged for the cost.

131.    For example, by memo dated April 7, 2010 to its "Valued Clients and Friends," Castle provided a legislative update regarding HB 1240 as follows:

> The Bill was amended in the late stages to include a new requirement that the Notice of Hearing for the Order Authorizing Sale pursuant to CRCP 120 be posted in the same fashion as the current notice under the deferment program.  This will be required on all CRCP 120 motions and is in addition to the notice/posting requirement under the deferment program. . . . This will result in an additional cost of $125 per foreclosure.

132.    Neither Castle nor Aronowitz obtained Fannie Mae's approval to charge $125 for the Rule 120 posting or explained why the additional posting would cost $125.  They simply used the price agreed upon in 2009 for the first posting, and began charging it for the second posting.

133.    When an Aronowitz billing manager asked Stacey Aronowitz by email dated May 7, 2010, how the firm came up with the $125 charge for the Rule 120 posting, Stacey Aronowitz wrote: "Cause 125 is what Castle is charging."

134.    Beginning May 5, 2010 with HB 1240, nearly all foreclosures in Colorado would require two postings, adding $200 in unreasonable and inflated charges to each foreclosure—in the approximately 30,000 foreclosures filed by Castle since the second posting went into effect.

### H. Market Rate of Foreclosure Postings

135.   Since 2009, the fair market rate for foreclosure deferment and Rule 120 postings has been around $25 per posting in counties containing the vast majority of foreclosures in the state.  For outer and distant counties, the fair market rate for postings has been around $40.

136.   Castle and Aronowitz knew the fair market rate for postings because they both used and continue to use posting companies to post similar eviction notices at $25 to $30 per posting.  The companies providing eviction postings were willing and able to post these foreclosure notices for the same price, but were largely shut out of competition when Castle and Aronowitz, which accounted for 75 percent of foreclosures, used their affiliated posting companies at a minimum of $125 per notice.  These unaffiliated companies were relegated to distant counties, difficult postings, and smaller foreclosure firms that did not have affiliated vendors.

### I.  Turning Posting into a Lucrative and Unlawful Profit Center

137.   For most foreclosure postings, Castle's and Aronowitz's affiliated posting vendors pay process servers $7 to $10, plus mileage, per posting, and then turn around to claim a cost of $125 that must be paid without challenge or inquiry.

138.   Since 2009, Absolute obtained more than $11M in foreclosure posting revenue by charging $125 per posting, and transferred at least $4M to RP Holdings and Next Organization, in which the Castle Defendants have ownership or control.

139.   The only reason that Castle and Aronowitz, and their affiliated vendors, could succeed in charging $125 per posting, while unaffiliated vendors charged around $25, is that their affiliated vendors were not restrained by market principles.  They were able to sell their posting services to themselves, and used affiliated vendors to generate inflated invoices for reimbursement from borrowers, servicers, investors, and taxpayers.

140.   As the two dominant firms and largest competitors in the foreclosure market, Castle's and Aronowitz's contract, combination, and conspiracy in restraint of trade, in coordination with their affiliated vendors, dramatically increased the cost of such services to homeowners, investors, servicers, and taxpayers, depressed and stifled competition from unaffiliated vendors charging reasonable and true market rate costs, and created the false impression to servicers and investors that $125 was an actual, reasonable, and market rate charge for this service.

## IV.   THE USE OF TITLE PRODUCTS TO OBTAIN UNJUST ENRICHMENT

### A.   Background

141.   In Colorado, foreclosure law firms must provide notice of a foreclosure proceeding to parties with a recorded interest in the property that would be affected by the foreclosure.  The most cost-effective title product containing this information is a two-owner title search report, which is an examination and report by a company of all applicable liens on the property.  The law firm uses this title search report to prepare a mailing list that it delivers to the public trustee, who in turn provides notice of the foreclosure to the persons with recorded interests.

142.   A foreclosure performed properly and with notice to all parties having a recorded interest conveys clear and marketable title to the person or lender receiving the property after foreclosure.  Colorado statute C.R.S. § 38-38-501 provides that title to the property sold at auction vests in the person receiving the property free and clear of all liens and encumbrances junior to the lien foreclosed.

143.   Many title search reports are straightforward, and reveal only the deed of trust in foreclosure and possibly one or two subsequent liens recorded prior to the foreclosure filing.

144.   The law firm first obtains the initial search report to commence the foreclosure, and then typically obtains two updates: one after the foreclosure notice is filed to ensure no liens are recorded before the foreclosure and one before sale to ensure no IRS tax liens are filed.

145.   Such two-owner title search reports are available from unaffiliated businesses in Colorado for around $100, which includes, among other things, a list and copy of all recorded liens going back two owners, a tax certificate, four updates, and a legal description.

### B. Overcharges on Fannie Mae Files for Title Search Reports

<u>Abuse of Fannie Mae's Maximum Allowable Title Search Cost</u>

146.   In 2007, Fannie Mae realized that foreclosure law firms were abusing the title process by obtaining expensive and unnecessary title products, such as title commitments, for a foreclosure.  Fannie Mae terminated this practice by imposing a cap on the amount spent for title products and by requiring the firms to obtain an uninsured title search report when it was less expensive than an insured product.

147.   The Fannie Mae Servicing Guide requires that "title costs to confirm

title and identify parties entitled to notice of the foreclosure must be kept at a minimum." Fannie Mae explained that an uninsured title search report reduces title expenses, minimizes the costs to borrowers reinstating their loans, minimizes credit losses, and reduces the cost of home ownership.

148.    Fannie Mae determined that because it was exceedingly rare to encounter post-foreclosure problems resulting from defective title searches, obtaining an insured title product during the foreclosure was largely unnecessary and simply resulted in additional revenue to the foreclosure law firms.

149.    Fannie Mae knew that it was improper for law firms to use title fees to substitute for a perceived lack of compensation from the maximum allowable fee and attempted to curtail the practice.

150.    Despite significant opposition from foreclosure law firms, Fannie Mae, in its July 2008 engagement letter with law firms, stated that Colorado law firms could charge up to a maximum cost of $250 for a title search report.  In August 2009, Fannie Mae increased the maximum cost to $275, but notified the law firms that it expected the actual cost to be lower in many instances.

151.    Despite the availability of the type of title search preferred by Fannie Mae—a two-owner title search report—from unaffiliated businesses for around $100, in late 2008 the Castle Defendants caused to be formed a title search company, RERR, to prepare search reports for Fannie Mae files and to generate invoices at $250 per report—Fannie Mae's maximum allowable cost at the time. When Fannie Mae increased the maximum allowable cost to $275 in 2009, RERR immediately, at the direction of Castle, raised its charge to $275 per report.

152.    RERR, which is owned and operated by the Castle Defendants' accountant Ryan O'Connell, has charged $275 per search since 2009, plus $75 for every update after the first two.  RERR often provides only a one-owner search report, which is often prepared by employees in Panama, but still charges $275, rather than the standard two-owner search report that unaffiliated companies provide for $100.

153.    RERR's charges are directed by the Castle Defendants.  For example, in a July 9, 2009 email, referencing a prior title search company that RERR replaced, RERR's Ryan O'Connell wrote: "Larry informed me that [RERR] should bill CMS [law firm] $75 for each Title America update that is being done. . . . I know that the billing of these pass-through expenses is complicated, so I wanted to make sure that you were both aware of the situation."

154.    Larry Castle's control of RERR is not limited to instructions on what to

charge the law firm.  For instance, in a 2011 email correspondence, RERR's and Absolute's Ryan O'Connell asks Larry Castle how much Larry Castle wants RERR and Absolute to contribute to a political campaign.

155.   The $275 claimed cost is neither the actual cost of the report nor the market rate; rather, it was what the law firm believed it could get away with charging, because Fannie Mae capped the *maximum* cost for title searches at that amount.  The Castle Defendants abused this maximum cost, knowing that they could get away with charging $275 for every foreclosure regardless of the complexity of the title search or its actual cost.

156.   Although it set a maximum allowable cost for a title search report, Fannie Mae emphasized in its 2008 Retained Attorney Network agreement and once again during a 2010 mandatory attorney training that it expected law firms to bill only their actual, necessary, and reasonable costs, which, according to Fannie Mae, would be lower than the maximum allowable cost in many instances.

157.   RERR is an efficiently-run operation that used or uses one to three employees in the United States and low-wage workers in Panama.  The cost to RERR to access the database containing search records is generally around $25 per file, including all documents and updates.  By contrast, at least one unaffiliated title search company uses six or more experienced persons doing searches in Colorado and carries the same database costs per search.

158.   While unaffiliated title search companies have arguably greater costs than RERR and still operate profitably by charging around $100, RERR has no market restraints and charges nearly three times as much for the same or inferior product, because it can sell the reports to its affiliated law firm, which is paid by borrowers, servicers, investors, and the public.

159.   By charging far in excess of the market rate, RERR has claimed revenues of more than $6M since 2009.

160.   RERR, like Castle's other affiliate, Absolute, funnels money back to the Castle Defendants through various means, including through the employee leasing company Professional Resources Organization owned by both O'Connell and Larry Castle (through SWE Investors); through the payment of financial and accounting services paid to IS Financial, also owned by O'Connell and Larry Castle (through SWE Investors), and through fees paid by RERR to Castle.

161.   Given the availability of these two-owner search reports for around $100 from unaffiliated vendors, there is no justification for RERR's increasing the cost to $275.  Fannie Mae's agreement with the law firms states: "Review of the title

report is included in the allowable legal fee for the jurisdiction and should not be added to the title cost." Accordingly, any review of the title report by the law firm is already compensated by the maximum allowable fee.

<u>Castle Defendants' Instructions to Be Billed More by Their Vendor</u>

162.   Castle's reaction to a slight increase in Fannie Mae's maximum allowable cost for a title search shows its intent to have its vendor charge the law firm as much as it could get away with.

163.   When Fannie Mae increased the maximum allowable cost for title searches to $275, Caren Castle immediately emailed RERR's Ryan O'Connell: "Please note change in fee!"

164.   Then, Ryan O'Connell announced by email a week later:

> I clarified with Larry the go forward billing plan from RERR for Fannie Mae files: Where applicable, RERR will bill an additional $25 for the Sales Update when they had initially billed $250. On all new billings, RERR will invoice the allowable of $275 and will perform all of the updates without additional billings.

This email reveals the plan between Castle and RERR to bill the maximum amount that the firm could get away with charging, rather than actual costs. Moreover, the firm's control over RERR is evidenced by Larry Castle's instruction to his vendor to charge the law firm *more* in light of the new maximum allowable cost. Again, Fannie Mae's definition of an affiliated business entity is, among other things, one in which the law firm principal has a direct or indirect decision-making interest.

165.   Communicating a similar sentiment, Larry Castle wrote an email to the law firm and Ryan O'Connell on August 27, 2009: "Here is the deal more fleshed out. Fannie Mae is now allowing $275 for the original search and 2 updates, including open files. Yesterday I met with [RERR] and they agreed, going forward from yesterday, that on all open orders from other title groups they will verify the original search and do up to 2 updates for the total $275."

166.   By email dated August 31, 2009, Ryan O'Connell wrote to Caren Castle and Larry Castle: "We will keep the invoice per file at $275 max."

167.   In 2011, Larry Castle instructed RERR to charge Castle $75 for title search updates, even though those updates were available from unaffiliated companies for $25 or less. In a January 27, 2011 email, RERR's Ryan O'Connell

wrote to a law firm employee:

> 2 Questions:
>
> 1) Have you sent the product description I sent you to the B of A contact? Larry wanted me to change some of the items in that. Let me know.
>
> 2) When is the effective date of the $75 for the third update? Will the process begin with updates delivered after 2/1 or all of the updates requested after 2/1? I just want to make sure we start on the same page. *And Larry does want the $75 fee for updates.*

(Emphasis added).

168. Demonstrating that there is an unreasonable, unnecessary, and deceptive foreclosure markup when the vendor sells its services to the law firm with which it is affiliated, RERR charges Castle $275 for a title search on Fannie Mae files when it knows Castle will be reimbursed by borrowers, servicers, and investors, but RERR charges non-foreclosure clients $40 to $150 for a similar search report.  Likewise, RERR charges Castle $75 for a title update search for which it charges non-foreclosure clients $5 to $15.

169. The Castle Defendants did nothing to determine whether the charges by RERR for the $275 title search report and $75 for the title search update constituted the market rate, or if they could obtain a lower price for these title products from an unaffiliated vendor.

170. RERR's $75 charge for each update after the first two updates compares unfavorably to unaffiliated search companies that charge around $100 for a complete title search report that includes four updates.

171. That the Castle Defendants direct a title search company to charge as much as possible without regard to the market rate or actual cost and will not consider using more cost-effective vendors to reduce costs is emblematic of how Castle exploits the foreclosure billing system to commit fraud.

### C.    Title Commitment Cancellation Scheme: Non-Fannie Mae Files

172. When servicers or investors do not specify which title product should be obtained in a foreclosure, Castle usually acquires a much more expensive "foreclosure title commitment" through its affiliated title company, CAT, in order to collect a large policy premium for an owner's policy.  This lucrative practice results

in a minimum of $400 to $500 per foreclosure in revenue to CAT, whether as a cancellation fee or some other fee, if the homeowner stops the foreclosure for any reason. If the foreclosure proceeds to auction, however, CAT receives in excess of $900 per foreclosure as a policy premium for an owner's policy.

173.   As Ryan O'Connell testified during the State's investigative hearing about becoming an owner of CAT:

> [T]he business model with foreclosure attorneys in Colorado, to my knowledge, was they drive the work to their title company. And the cash cow, as you might consider, is the area where the foreclosure attorneys have an opportunity to make some money.

174.   While CAT is now owned by Ryan O'Connell through his acquisition of the RP Holdings' assets in late 2012, it was previously owned by RP Holdings, in which Larry and Caren Castle had a financial interest.

175.   A foreclosure commitment converts into an insured owner's policy if the foreclosed property goes to sale and certain requirements are met. A foreclosure commitment is based entirely on the title search report available or obtained from an unaffiliated title search company for around $100, which represents the vast majority of the work involved with preparing a commitment. The information from this title search report is transferred or merged into a template called "commitment for title insurance." Most of the commitment consists of form language and requires entry of a handful of exceptions and requirements. Any additional information for the title commitment, such as covenants and restrictions, may also come from the original lender's title policy and results in no cost to the law firm's title agent.

176.   An underwriter must file its insurance rates with the Colorado Division of Insurance. Agents are then required to charge these filed rates, which are the insurance premiums, in issuing title products insured by the underwriter. By contrast, an underwriter's schedule of fees, including a foreclosure commitment cancellation fee or similar fee, is not an insured product or rate. The agent is therefore free to file a different fee than the underwriter.

177.   The agency agreements between agents and underwriters recognize that agents may file fees different from those of the underwriter.

178.   If a foreclosed property goes to sale, the law firm's affiliated title agent, CAT, charges the full premium amount for an owner's policy, which is filed as a rate of insurance with the Colorado Division of Insurance by the underwriter. Typically the filed rate for an owner's policy is between $900 and $1,400, which depends on

the amount to be insured.  As the title agent, CAT retains 85 to 90 percent and only remits 10 to 15 percent to the underwriter.

179.   If a foreclosed property does not go to sale and thus the commitment cannot turn into an owner's policy, CAT charges a fee of $400 to $500 despite the fact that such fees are not required and do not reflect the actual work performed.

180.   In either scenario, as confirmed by Ryan O'Connell, this practice has indeed been a "cash cow" for the law firm's affiliated title agent.

181.   As described above, Fannie Mae recognized that obtaining a title commitment during a foreclosure results in little benefit to the investor but enormous benefit to the law firm/title agent.  Other investors and servicers have not yet followed suit to limit the law firm's ability to obtain title commitments during the foreclosure, allowing the Castle Defendants, CAT, and Ryan O'Connell to abuse this process by routinely preparing a title commitment for many non-Fannie Mae loan types immediately upon receipt of the foreclosure referral from the servicer.

182.   Because the $400 or $500 fee for a cancelled foreclosure commitment obtained during a foreclosure is not a filed rate with the Colorado Division of Insurance, Castle's affiliated title agent CAT retains 100 percent of this fee.  By contrast, the policy premium for an owner's policy is a filed rate and CAT retains 85 to 90 percent of the premium.  In either scenario, obtaining a title commitment during a foreclosure results in significant financial benefit to the law firm's affiliated title agent, and to the law firm's principals.  However, for the homeowner who stops the foreclosure, it results in an unreasonable and excessive charge.

183.   Regardless of whether a title commitment during the foreclosure is necessary or advisable, charging homeowners $400 to $500 for stopping a foreclosure for a cure or loan modification is deceptive and unreasonable given the actual cost incurred in preparing a commitment.

184.   By converting the $100 title search report, which comprises most of the work, into a commitment, CAT immediately claims a "cost" of $400 to $500.

185.   Castle also routinely claims on bid statements presented to the public the policy premium for an owner's policy, which must be paid by the person bidding on the property whether or not she needs or uses the policy.

186.   Yet another stark illustration of the vastly higher and unnecessary costs charged for foreclosure versus non-foreclosure services is the fact that title agents preparing commitments for non-foreclosure transactions generally do not charge a cancellation fee at all.

187.   As an example, at least one underwriter in Colorado has published a schedule of fees allowing a $500 cancellation fee for *foreclosure* commitments, but only a $100 cancellation fee for *non-foreclosure* commitments.  In the case of non-foreclosure commitments, however, agents may only charge the published $100 fee if there is excessive or unusual work performed prior to cancellation.

188.   This discrepancy is the result of foreclosure law firm/agents having influence over the underwriters, which rely on agents for business.

189.   Nevertheless, that the underwriter may allow for a cancellation or other special foreclosure-related commitment fee does not mean the affiliated law firm title agent has to charge it—particularly when the cost is disproportionate to amount of work performed and is ultimately borne by the public.

## V.   MISREPRESENTATION OF FEES AS COSTS: STATEMENT OF QUALIFIED HOLDER AND OTHER MISCELLANEOUS SERVICES

190.   Castle also routinely charged as a "cost" $50 for the law firm's preparation of a simple document called the "statement of qualified holder," which is filed in nearly all foreclosures and is already compensated by the maximum allowable fee.  The law firm prepares this document simply by checking a few boxes on a form statement.  Because it is the law firm that completes this work and there is no associated cost to it, any charge for a statement of qualified holder constitutes work that is covered by the maximum allowable fee.

191.   However, knowing that charging a separate fee for this work would be prohibited by the maximum allowable fee and, more importantly, detected and potentially rejected by the automated billing system, Castle misrepresented this charge of $50 as a "cost," and concealed it in its client invoices so that it would go undetected.  This amount was then paid by borrowers, the public, and investors.

192.   Thus, where the maximum allowable fee for the foreclosure by the investor was $875, Castle would conceal another $50 as a cost to unilaterally increase the maximum allowable fee to $925.

193.   There is no actual cost for a statement of qualified holder.  Rather, it is one of a handful of documents the law firm uses to initiate a routine foreclosure.

194.   The statute allowing for use of the statement of qualified holder went into effect January 1, 2008.  It was intended to make foreclosures more cost effective by eliminating the need for original or certified copies of the loan documents, instead permitting the attorney to sign and file with the public trustee a

simple document stating that the loan documents are true and correct copies.

195.   Nevertheless, Castle falsely, improperly, and deceptively charged a fee for this routine service above the maximum allowable fee, but concealed it by labeling it as a "cost" when submitting invoices to servicers, which are in turn paid by borrowers, investors, insurers, and the public.

196.   According to Caren Castle's testimony during the State's investigative hearing, the law firm stopped charging for the statement of qualified holder if servicers questioned the charge and, if not questioned, when the maximum allowable fee increased in 2012.

197.   In periodic reports prepared by Castle for Fannie Mae, Castle sought to use the $50 allegedly incurred in preparing the statement of qualified holder as a basis to increase the maximum allowable fee—identifying the statement of qualified holder as an item that the law firm prepares but cannot bill for, even though Castle consistently billed and received payment for the document as a "cost."

198.   Castle similarly charges inflated amounts for other services for which it incurred minimal costs.

199.   Castle charges $25 for a simple PACER search on the federal courts database to identify whether a borrower in foreclosure has filed for bankruptcy, though the actual cost or market rate of this service is $3 or less.

200.   Castle frequently charges $10 to $25 to perform a search of the military database—available for free—to determine whether a borrower is in the military, though there is no actual cost.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Makes false or misleading statements of fact concerning the price of services in violation of C.R.S. § 6-1-105(1)(l))
(All Defendants)

201.   The State of Colorado incorporates herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint.

202.   As set forth in detail above, Defendants made "false or misleading statements of fact concerning the price of . . .  services" on reinstatements, cures, bids, and invoices regarding the amounts claimed for:

    a.  posting foreclosure deferment notices;

  b. posting Rule 120 notices of hearing;

  c. title searches;

  d. title commitment cancellation fees;

  e. statements of qualified holder; and

  f. other foreclosure-related charges.

  203. Through the conduct set forth in the Complaint and in the course of their business, vocation, or occupation, Defendants violated C.R.S. § 6-1-105(1)(l) by making "false or misleading statements of fact concerning the price of . . . services" and as a result deceived and defrauded homeowners, the public, servicers, and investors/insurers, and obtained unjust enrichment as a result.

## SECOND CLAIM FOR RELIEF

(Horizontal conspiracy to fix, raise, stabilize, and control prices for foreclosure-related postings in violation of Colorado's Antitrust Act , C.R.S. § 6-4-104)
(Defendants Castle, Caren Castle, Larry Castle, Absolute, Kathleen Benton, and Ryan O'Connell)

  204. The State of Colorado incorporates herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint.

  205. As set forth in detail above, the Castle Defendants entered into a continuing agreement, understanding, and conspiracy with Stacey Aronowitz and Aronowitz in restraint of trade to artificially fix, raise, stabilize, and control prices for foreclosure-related postings in Colorado.  But for their agreement with Aronowitz, the Castle Defendants, Absolute, Kathleen Benton, and Ryan O'Connell would not have been able to charge the agreed-upon minimum price of $125 for foreclosure-related postings in Colorado.

  206. This conspiracy among and between horizontal competitors Castle and Aronowitz constitutes a per se violation of the Colorado Antitrust Act. Alternatively, the unlawful conspiracy caused anticompetitive effects that substantially outweigh any procompetitive justification, if any exist, in violation of the rule of reason analysis under the Colorado Antitrust Act.

  207. By preventing the competitive pricing of foreclosure-related postings in Colorado, Defendants deprived homeowners, purchasers, investors, and taxpayers the benefits of the competition that the Colorado Antitrust Act was designed to promote, preserve, and protect.

208.   As a direct and proximate cause of Defendants' unlawful conduct, unaffiliated process servers and posting companies have been injured in their ability to compete in the foreclosure posting marketplace.

209.   As a direct and proximate cause of Defendants' unlawful conduct, homeowners, purchasers, investors/insurers, and taxpayers have been required to pay $125 per posting instead of the $25 amount that would have been available in the absence of the illegal collusion.

210.   As a direct and proximate cause of Defendants' unlawful conduct, injury has been sustained by the general economy in the state of Colorado.

**THIRD CLAIM FOR RELIEF**

(Violation of Colorado Fair Debt Collection Practices Act – False or Misleading Representations – Unfair Practices – C.R.S. § 12-14-107(1)(b)(I))
(Defendants Castle, Larry Castle, and Caren Castle)

211.   The Administrator incorporates herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint.

212.   As set forth in detail above, Defendants used false, deceptive, or misleading representations, including the false representations of the character, amount, or legal status of any debt, in connection with the collection of a debt relating to amounts claimed on reinstatements, cures, bids, and invoices for:

    a.  posting foreclosure deferment notices;

    b.  posting Rule 120 notices of hearing;

    c.  title searches;

    d.  title commitment cancellation fees;

    e.  statements of qualified holder; and

    f.  other foreclosure-related charges.

213.   As a result of Defendants' violations of section 12-14-107(1)(b)(I) of the CFDCPA, the Administrator is entitled to injunctive relief restraining Defendants from engaging, directly or indirectly, in consumer debt collection or otherwise committing any of the acts, conduct, transactions, or violations described above, or otherwise violating the CFDCPA, together with all such other relief as may be required to completely compensate or restore to their original position all consumers injured or prevent unjust enrichment of any person, by reason or through the use or

employment of such practices, acts, conduct, or violations, or as may otherwise be appropriate, including, without limitation, requiring Defendants to disgorge to the Administrator or refund to consumers all amounts collected in violation of the CFDCPA. C.R.S. § 12-14-135.

## FOURTH CLAIM FOR RELIEF

(Violation of Colorado Fair Debt Collection Practices Act – Unfair Practices – C.R.S. § 12-14-108(1)(a))
(Defendants Castle, Larry Castle, and Caren Castle)

214.    The Administrator incorporates herein by reference all of the allegations contained in the foregoing paragraphs of this Complaint.

215.    As set forth in detail above, Defendants collected amounts, including fees, charges, and expenses incidental to the principal obligation that were not expressly authorized by the agreement creating the debt or permitted by law, including for amounts claimed on reinstatements, cures, bids, and invoices for:

   a.  posting foreclosure deferment notices;

   b.  posting Rule 120 notices of hearing;

   c.  title searches;

   d.  title commitment cancellation fees;

   e.  statements of qualified holder; and

   f.  other foreclosure-related charges.

216.    By reason of the foregoing, Defendants used, and continue to use, unfair or unconscionable means to collect or attempt to collect any debt, including the collection of any amount unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

217.    As a result of Defendants' violations of section 12-14-108(1)(a) of the CFDCPA, the Administrator is entitled to injunctive relief restraining Defendants from engaging, directly or indirectly, in consumer debt collection or otherwise committing any of the acts, conduct, transactions, or violations described above, or otherwise violating the CFDCPA, together with all such other relief as may be required to completely compensate or restore to their original position all consumers injured or prevent unjust enrichment of any person, by reason or through the use or employment of such practices, acts, conduct, or violations, or as may otherwise be appropriate, including, without limitation, requiring Defendants to disgorge to the

Administrator or refund to consumers all amounts collected in violation of the CFDCPA. C.R.S. § 12-14-135.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that the Defendants be enjoined and restrained from doing any of the wrongful acts referenced in this Complaint or any other act in violation of the Colorado Consumer Protection Act, C.R.S. §§ 6-1-101 – 6-1-115, the Colorado Antitrust Act of 1992, C.R.S. §§ 6-4-101 – 6-4-122, and the Colorado Fair Debt Collection Practices Act, C.R.S. §§ 12-14-101 – 12-14-137.

In addition, Plaintiffs request a judgment against the Defendants, personally, jointly and severally, for the following relief:

A.   An order that all Defendants' conduct violates the Colorado Consumer Protection Act, including, but not limited to, section 6-1-105(1)(l);

B.   An order pursuant to section 6-1-110(1) for an injunction or other orders or judgments against all Defendants;

C.   An order pursuant to section 6-1-110(1) requiring all Defendants to disgorge all unjust proceeds to prevent unjust enrichment;

D.   An order pursuant to section 6-1-110(1) against all Defendants which may be necessary to completely compensate or restore to their original position any persons injured by means of such deceptive practice;

E.   An order pursuant to section 6-1-112(1)(a) against all Defendants for civil penalties of not more than two thousand dollars for each such violation of any provision of the Colorado Consumer Protection Act with respect to each consumer or transaction involved not to exceed five hundred thousand dollars for any related series of violations;

F.   An order pursuant to section 6-1-112(1)(c) against all Defendants for civil penalties of not more than ten thousand dollars for each violation of any provision of the Colorado Consumer Protection Act with respect to each elderly person;

G.   An order pursuant to section 6-1-113(4) requiring all Defendants to pay the costs and attorney fees incurred by the Attorney General;

H.   Any such further relief as this Court may deem just and proper to effectuate the purposes of the Colorado Consumer Protection Act;

I.     An order that Castle's, Caren Castle's, Larry Castle's, Absolute's, Kathleen Benton's, and Ryan O'Connell's conduct violates the Colorado Antitrust Act, §§ 6-4-101 - 6-4-122.

J.     An order pursuant to section 6-4-112(1) for the maximum civil penalties against Castle, Caren Castle, Larry Castle, Absolute, Kathleen Benton, and Ryan O'Connell of not more than two hundred fifty thousand dollars for each violation of the Colorado Antitrust Act;

K.     An order pursuant to section 6-4-111(4) requiring Castle, Caren Castle, Larry Castle, Absolute, Kathleen Benton, and Ryan O'Connell to pay the costs and attorney fees incurred by the Attorney General;

L.     An order pursuant to section 6-4-111 for an injunction or other orders or judgments against Castle, Caren Castle, Larry Castle, Absolute, Kathleen Benton, and Ryan O'Connell;

M.     Any such further relief as this Court may deem just and proper to effectuate the purposes of the Colorado Antitrust Act;

N.     An order that Castle's, Larry Castle's, and Caren Castle's conduct violates the Colorado Fair Debt Collection Practices Act, section 12-14-107(1)(b)(I);

O.     An order that Castle's, Larry Castle's, and Caren Castle's conduct violates the Colorado Fair Debt Collection Practices Act, section 12-14-108(1)(a);

P.     An order pursuant to section 12-14-135 of the Colorado Fair Debt Collection Practices Act for an injunction against Castle, Larry Castle, and Caren Castle together with all such other relief as may be required to completely compensate or restore to their original position all consumers injured or prevent unjust enrichment of any person or as may otherwise be appropriate, including disgorgement to the Administrator or refund to consumers;

Q.     An order pursuant to section 12-14-135 of the Colorado Fair Debt Collection Practices Act for civil penalties against Castle, Larry Castle, and Caren Castle;

R.     An order pursuant to section 12-14-135 of the Colorado Fair Debt Collection Practices Act against Castle, Larry Castle, and Caren Castle for an award of reasonable costs and attorney fees; and

S.     Any such further orders as the Court may deem just and proper to effectuate the purposes of the Colorado Consumer Protection Act, the Colorado Antitrust Act, and the Colorado Fair Debt Collection Practices Act.

Respectfully submitted this 14th day of July 2014,

JOHN W. SUTHERS
Attorney General

*/s/ Erik R. Neusch*
_____
ALISSA GARDENSWARTZ*
First Assistant Attorney General
ERIK R. NEUSCH*
MEGAN PARIS RUNDLET*
JOHN FEENEY-COYLE*
REBECCA M. TAYLOR*
MARK L. BOEHMER*
LAUREN M. DICKEY*
Assistant Attorneys General
Attorneys for Plaintiff
*Counsel of Record

Plaintiff's Address:
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, Colorado 80203


*Pursuant to C.R.C.P. 121, § 1-26(7), the original of this document with the original signature is maintained at the offices of the Colorado Attorney General, Ralph L. Carr Colorado Judicial Center, 1300 Broadway, Denver, Colorado 80203, and will be made available for inspection upon request.*